927 F.2d 963
 32 Soc.Sec.Rep.Ser. 586, Medicare&Medicaid Gu 39,438
HEALTH EQUITY RESOURCES, URBANA, INCORPORATED, doing
business as Royal Fontana Nursing Center,
Plaintiff-Appellant,
v.
Louis W. SULLIVAN, Secretary of Health and Human Services,
Defendant-Appellee.
 No. 90-1215.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 18, 1991.
Decided March 13, 1991.
 
 Ronald S. Mangum, Terrence J. Benshoof, Mangum, Smietanka & Johnson, Chicago, Ill., for plaintiff-appellant.
 Frances C. Hulin, Asst. U.S. Atty., Danville, Ill., Alvin N. Jaffe, Dept. of Health and Human Services, Region V, Office of the General Counsel, Chicago, Ill., for defendant-appellee.
 Before BAUER, Chief Judge, and POSNER and RIPPLE, Circuit Judges.
 POSNER, Circuit Judge.
 
 
 1
 In February of 1988, following an inspection, the Health Care Financing Administration, which is part of the Department of Health and Human Services, notified Royal Fontana Nursing Center, a 99-bed nursing home in Urbana, Illinois, that it was canceling Royal Fontana's Medicaid contract because of deficiencies in nursing care, rehabilitative services, social services, physical maintenance, and control of infection. 42 U.S.C. Sec. 1396i(c). (The statute has since been amended to narrow the scope of its application, but the amended version does not govern this case.) The notification fixed April as the date of termination. But before the termination could become effective, Royal Fontana's owner was entitled to a hearing before an administrative law judge of the Health Care Financing Administration. Sec. 1396i(c)(2). It requested such a hearing. In August 1988, Health Equity Resources, the plaintiff in this case, a buyer and operator of nursing homes some of which are "troubled," bought Royal Fontana Nursing Center. Health Equity knew about the termination proceeding. Pursuant to a regulation of the Administration, 42 C.F.R. Sec. 442.14, Royal Fontana's Medicaid contract was automatically assigned to Health Equity, together with all the conditions in the contract, one of which was that the contract would terminate if and when the administrative law judge upheld the termination order. Since Royal Fontana's contract was now Health Equity's contract, Health Equity was substituted for Royal Fontana in the proceeding before the administrative law judge.
 
 
 2
 In January of last year, with that proceeding still pending before the administrative law judge, Health Equity filed this lawsuit, seeking to enjoin the termination of Royal Fontana's Medicaid contract. The district judge dismissed the suit for want of jurisdiction. While the appeal from that dismissal was pending in this court, the administrative law judge, in July of last year, upheld the termination of Royal Fontana's--which is to say Health Equity's--Medicaid contract. With his decision, that termination finally became effective, pursuant to section 1396i(c)(2) as interpreted in Wayside Farm, Inc. v. U.S. Dept. of Health & Human Services, 863 F.2d 447 (6th Cir.1988); and we do not understand Health Equity to be challenging that interpretation. However, the State of Illinois, which administers the Medicaid program in Illinois with financial assistance from the federal government no longer available for services provided at the Royal Fontana nursing home, has made a loan to Health Equity to enable the nursing home to keep its Medicaid patients. The state can do this because the Health Care Financing Administration is not forcing Health Equity to close down the Royal Fontana or to discharge its Medicaid patients; the Administration just won't provide federal funds for reimbursing Health Equity under the Medicaid program. The state, through the loan, has assumed the financial burden because it bears the ultimate responsibility for these patients and has, for the time being anyway, nowhere else to put them.
 
 
 3
 Health Equity had a right to appeal the administrative law judge's decision to the Appeals Council of the Health Care Financing Administration. It exercised that right, and the case is now before the Appeals Council, awaiting decision. At any time after the administrative law judge confirmed the termination of its Medicaid contract--even before the Appeals Council decided the appeal--Health Equity could have sought reinstatement of its (formerly Royal Fontana's) Medicaid contract by showing "that the reason for termination has been removed and there is reasonable assurance that it will not recur." 42 U.S.C. Sec. 1396i(c)(1). Although Health Equity claims to have cured the deficiencies in the operation of the Royal Fontana that led to the termination, it has not applied for reinstatement, fearing--it tells us--that such a move would be construed as a waiver of its right to maintain its challenges (in the Appeals Council and in the federal courts) to the termination order.
 
 
 4
 The Medicaid statute provides for judicial review in accordance with the review provision of the Social Security Act. 42 U.S.C. Sec. 1396i(c)(2). That provision, 42 U.S.C. Sec. 405(g), provides for review only of final decisions of the Secretary of Health and Human Services, meaning that the seeker of judicial review must have exhausted all his administrative remedies, including, in this case, appeal to the Appeals Council of the Health Care Financing Administration. Bowen v. City of New York, 476 U.S. 467, 472, 482, 106 S.Ct. 2022, 2026, 2031, 90 L.Ed.2d 462 (1986). Until then, there is no final decision. Health Equity filed this suit not only before the Appeals Council had decided its appeal but before the appeal had even been filed--in fact before the administrative law judge had rendered his decision. That was grossly premature.
 
 
 5
 It is true that, ordinarily, exhaustion of administrative remedies is not required if it would be futile, that is, if there is no reasonable prospect that the applicant could obtain any relief by pursuing them. Randolph-Sheppard Vendors of America v. Weinberger, 795 F.2d 90, 105-07 (D.C.Cir.1986). And although Weinberger v. Salfi, 422 U.S. 749, 766, 95 S.Ct. 2457, 2467, 45 L.Ed.2d 522 (1975), holds that futility is not an excuse under section 405(g), futility comes in by the back door, through the judge-made rule that allows a party to an administrative proceeding to bypass the administrative process by mounting "a collateral attack rather than one on the merits" in circumstances demonstrating a compelling need for immediate judicial review. Johnson v. Sullivan, 922 F.2d 346, 353 (7th Cir.1990) (en banc); see also Bowen v. City of New York, supra, 476 U.S. at 483, 106 S.Ct. at 2031. If, therefore, the party wants to challenge a regulation that is preventing him from making his case on the merits and he cannot feasibly defer the challenge to the conclusion of the administrative proceeding, he can bring his judicial action forthwith.
 
 
 6
 So futility is not an excuse for failure to exhaust administrative remedies, but futility plus hardship is. In the City of New York case, for example, a class of applicants for social security disability benefits who had been denied benefits on the basis of an unpublished, indeed secret, regulation were allowed to challenge the regulation without first exhausting their administrative remedies. Some of the applicants had not discovered the regulation until the administrative decisions denying them benefits had become final by conventional criteria of finality and the time for judicial review of those "final" decisions had expired. The applicants could not be faulted for failing to challenge a regulation that they didn't know about--this was the futility of exhaustion--and the hardship came from the fact that their time to challenge it had now passed. Other applicants still had time to exhaust their administrative remedies--they were like Health Equity in this regard--but were excused anyway, on the basis of a finding by the district court that the ordeal of having to go through the administrative appeals process might trigger a severe medical setback. 476 U.S. at 483, 106 S.Ct. at 2031. See also Mathews v. Eldridge, 424 U.S. 319, 330-31, 96 S.Ct. 893, 900-01, 47 L.Ed.2d 18 (1976).
 
 
 7
 The principle embodied in these decisions, fiercely criticized though it has been by Professor Davis, 4 Davis, Administrative Law Treatise Sec. 26:8 (2d ed. 1983), is at least comprehensible when understood as reading section 405(g) by the light of the concept of practical finality that has sometimes been used to mitigate the severity of the final judgment rule of 28 U.S.C. Sec. 1291. 15 Wright, Miller & Cooper, Federal Practice and Procedure Sec. 3913 (1976). But neither requirement for applying the "futility plus hardship" doctrine is satisfied in this case. The first may seem to be, because Health Equity's attack is not on the ruling that the operation of the Royal Fontana had violated the terms of the Medicaid contract--the ruling on the merits--but on the agency's refusal to allow Health Equity to ward off termination by showing that it has cured the deficiencies in the Royal Fontana's operation. The regulation that Health Equity wants to challenge prevents it from introducing evidence that would demonstrate the injustice of the agency's action. But there is nothing--so far as we are informed, at any rate--to prevent Health Equity from challenging the regulation before the Appeals Council. Pittston Coal Group v. Sebben, 488 U.S. 105, 123, 109 S.Ct. 414, 424, 102 L.Ed.2d 408 (1988); Johnson v. Sullivan, supra, 922 F.2d at 355. The challenge may, probably will, fail, but that does not make it futile; most appeals fail.
 
 
 8
 And what is the hardship? The loss of a Medicaid contract could of course be a financial blow to a nursing home, even if not all of its patients were Medicaid patients. (We have not been told what fraction of the Royal Fontana's patients were Medicaid patients--only that 75 percent of its revenues are derived from Medicaid and Medicare.) Yet until the administrative law judge handed down his decision, the Medicaid contract for the Royal Fontana remained in force; afterward, any direct pecuniary harm was staved off, for the time being anyway, by the loan from the State of Illinois. The state's patience may not be inexhaustible, but neither will the proceeding in the Appeals Council last forever. Health Equity has given us no reason to believe that the loan will be called before the Appeals Council acts. It is true that the loan was not made until the administrative law judge upheld the termination of the Medicaid contract, which was after this suit had been filed and dismissed, so it was too late for the parties to make a record in the district court concerning the loan--its terms, duration, etc. But as soon as the administrative law judge acted, Health Equity asked the district court and then this court to stay his order (both courts refused)--not because the order had inflicted any direct pecuniary harm on Health Equity, but because the termination of its Medicaid contract has besmirched its good name in the nursing-home community. This is also the irreparable harm claimed in Health Equity's brief in this court. We are baffled by the claim. Health Equity bought the Royal Fontana nursing home after the Health Care Financing Administration had issued its order of termination. It bought knowing that the regulations of the Administration would automatically substitute the purchaser for Royal Fontana as the Medicaid provider, so that if and when the administrative law judge upheld the order of termination it would be Health Equity's contract that was terminated. The price that Health Equity paid for the Royal Fontana--a figure that Health Equity's lawyer surprisingly but perhaps significantly was unable to tell us--no doubt was discounted to reflect the probability that the termination order would be upheld and that there might be some publicity fallout upon Health Equity.
 
 
 9
 If there really were irreparable harm here, we imagine that Health Equity would have asked the Appeals Council to accelerate its consideration of the appeal--which Health Equity has not done--or would have filed for reinstatement, which it hasn't done either, believing without any basis we can find that filing for reinstatement would operate as a waiver of its procedural rights. Although the rules of the Appeals Council contain no provision for the acceleration of an appeal, it does not follow that the Council has no power to accelerate; on the contrary, an adjudicative tribunal has inherent power to manage its calendar, in the absence of statute or regulation prescribing the order in which the tribunal must consider the cases tendered to it. Will v. Calvert Fire Ins. Co., 437 U.S. 655, 665, 98 S.Ct. 2552, 2558, 57 L.Ed.2d 504 (1978) (plurality opinion). So any irreparable harm here was triply self-inflicted: Health Equity bought the Royal Fontana knowing its contract had been (provisionally) terminated, failed to request reinstatement, and failed to ask the Appeals Council to speed up the decision of the appeal.
 
 
 10
 To state our conclusion on jurisdiction very mildly, Health Equity has not presented an adequate reason for bypassing the settled machinery for adjudicating challenges to administrative decisions in the health field. And while it is true that 42 U.S.C. Sec. 405(h), which expressly makes section 405(g) the exclusive route for obtaining judicial review of decisions by the Social Security Administration, was not incorporated into the Medicaid statute (as it was into the Medicare statute, 42 U.S.C. Sec. 1395ii), we do not interpret the omission as abrogating the doctrine of exhaustion of remedies in Medicaid cases. The incorporation of section 405(g) can only be understood as a determination to make section 405(g) the route for judicial review of Medicaid determinations, since if it were only a route every provider would avoid it, as Health Equity has tried to do by basing its suit not on section 405(g) but on 28 U.S.C. Sec. 1331, the general federal-question jurisdictional statute. Even if this end run could succeed to the extent that section 1331 might (though we think not) be thought, in the absence of section 405(h), to provide an alternative basis to section 405(g) for federal court jurisdiction, it would not follow that the doctrine of exhaustion of administrative remedies was inapplicable. That doctrine is not tied to section 405(g). Granted, Weinberger v. Salfi interprets section 405(g) as incorporating a particularly severe version of the doctrine; but even the less severe versions would rebuke the gratuitous impatience displayed by Health Equity in this case.
 
 
 11
 Lest Health Equity think that it can refile this suit if and when the Appeals Council affirms the administrative law judge, we add that the suit is as frivolous as it is premature, and on both counts fails to invoke the jurisdiction of the federal courts. Crowley Cutlery Co. v. United States, 849 F.2d 273, 276 (7th Cir.1988), and cases cited there. Health Equity argues that the loss of reputation that it fears as a result of the termination of its Medicaid contract, and that is also the basis of its futile appeal to the hardship half of the test for excusing a party from having to exhaust administrative remedies, will if it occurs be a deprivation of property within the meaning of the due process clause. But reputation is not property in that sense. Paul v. Davis, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). It is true that a number of cases, illustrated by Lawson v. Sheriff of Tippecanoe County, 725 F.2d 1136 (7th Cir.1984), hold that firing a public employee in circumstances that publicly "stigmatize" him as dishonest or incompetent deprives him of his liberty of employment and therefore may not be done without due process, such liberty being a component of the "life, liberty, or property" to which the due process clause refers. These cases build from the gloss that Paul v. Davis had placed on Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971). In that case a town's police chief had caused to be posted in all retail liquor outlets in the town a notice that they were forbidden to sell liquor to the plaintiff, and in holding that the chief could not do this without giving the plaintiff due process the Court noted that the posting was "a stigma, an official branding of a person. The label is a degrading one." Id. at 437, 91 S.Ct. at 510. From this one might have inferred that defamation by a public official was actionable under the due process clause. But the Court in Paul v. Davis scotched this suggestion, emphasizing that "the government action taken in that case [Constantineau ] deprived the individual of a right previously held under state law," and therefore "significantly altered his status as a matter of state law." There was more than defamation; there was, as in the employment cases, the infringement of a liberty--the liberty to purchase goods.
 
 
 12
 The extent to which the combination of an injury to reputation with "a change in legal status" might be actionable under the due process clause at the behest of an institution as distinct from an individual remains open. Somerset House, Inc. v. Turnock, 900 F.2d 1012, 1015 (7th Cir.1990). We tend to think of liberty as the interest of an individual rather than of a business firm or other artificial person. Defamatory conduct by public officials that caused the revocation of a license or other property right of a business firm might meet the "altered legal status" test, but there is nothing of that sort here and Goulding v. Feinglass, 811 F.2d 1099, 1103 (7th Cir.1987), holds that there is no property right to carry on a business as such.
 
 
 13
 We need not pursue these interesting questions further. Even if Health Equity was deprived of liberty or property, this can make no difference to the outcome because there was no denial of due process. Health Equity received a full hearing before an administrative law judge before it was terminated. Due process required no more, and probably less. Northlake Community Hospital v. United States, 654 F.2d 1234, 1243 (7th Cir.1981); American Healthcare Corp. v. Schweiker, 688 F.2d 1072, 1083-84 (7th Cir.1982); Patchogue Nursing Center v. Bowen, 797 F.2d 1137, 1144 (2d Cir.1986).
 
 
 14
 By arguing that the regulation which substituted it for Royal Fontana in the termination proceeding cut off its right to present evidence to the administrative law judge proving that it had corrected the deficiencies which led to the termination, Health Equity tries to give the case a due process flavor. But it is only a flavor. The evidence was irrelevant, given the statutory scheme; and the refusal to admit irrelevant evidence in a legal proceeding is an example of due process, not of its denial. The real challenge, then, is to the regulatory scheme itself, and it is a scheme that strikes us as eminently sensible and certainly not a violation of any constitutional or statutory provision. The termination proceeding is limited to the deficiencies uncovered in the inspection, and the correction of those deficiencies is adjudicated when and if the terminated nursing-home operator seeks reinstatement. Health Equity thinks the Constitution entitles it to ward off termination by showing that it has corrected its predecessor's deficiencies, even if it is not prepared to provide reasonable assurance that they will not recur--for if it is so prepared, it can obtain reinstatement. It wants in other words a regime under which a Medicaid provider can violate his contract with impunity and when caught sell out to a purchaser of "troubled" homes, like Health Equity, without termination of the contract, provided only that the purchaser cures the deficiencies before termination is to become effective and submits proof of such cure before the proceeding is over. Such a regime would not only stretch out the administrative process by requiring the administrative law judge to reopen the termination proceeding after the close of the record; it would also weaken the incentives of nursing-home operators to comply with Medicaid contracts, for there would be no penalty for what could be a protracted period of noncompliance.
 
 
 15
 AFFIRMED.
 
 
 16
 RIPPLE, Circuit Judge, concurring in part and dissenting in part.
 
 
 17
 I join the judgment of the court and the essential reasoning of the majority opinion. I must respectfully decline, however, from joining the dicta, ante at 9, suggesting unnecessarily restricted protection for corporate entities under the due process clauses of the fifth and fourteenth amendments. As the court quite correctly notes in the following paragraph, even if Health Equity was deprived of liberty or property, there was no denial of due process.