In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 05-3912

ROBERT BROWN,

*Plaintiff-Appellant*,

*v.*

CITY OF MICHIGAN CITY, INDIANA,

*Defendant-Appellee*.

———————

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 02 C 572—**Robert L. Miller, Jr.**, *Chief Judge.*

———————

ARGUED APRIL 6, 2006—DECIDED SEPTEMBER 5, 2006

———————

Before RIPPLE, MANION and KANNE, *Circuit Judges.*

RIPPLE, *Circuit Judge.* On August 1, 2002, Robert Brown was banned from all properties or programs operated by the Michigan City Department of Parks and Recreation. On August 13, 2002, he filed this suit against the City of Michigan City, Indiana ("City"); he alleged that the ban violated his rights to procedural and substantive due process guaranteed by the Fourteenth Amendment. On September 19, 2005, the United States District Court for the Northern District of Indiana granted summary judgment in favor of

the City. Mr. Brown now appeals. For the reasons set forth in this opinion, we affirm the judgment of the district court.

# I

## INTRODUCTION

### A. Facts

Mr. Brown is a resident of Michigan City, Indiana. Washington Park (the "park") is the largest public park in Michigan City, and is located on the shores of Lake Michigan. Residents, including Mr. Brown, may enter the park free of charge with a resident pass. According to Mr. Brown, sometime in 1988, he began visiting Washington Park on a daily basis with his wife; they would "sit and watch the sunsets and sunrises, drink coffee, smoke cigarettes." Brown Dep., R.49, Tab 3 at 20. After his wife passed away later that year, he continued this routine: Over the course of approximately fourteen years, in the morning, he would drive his R.V. to Washington Park, park near the lake, drink his coffee, smoke cigarettes and watch people at the beach, sometimes with binoculars.[1] He did not leave his van on most occasions.

On July 2, 2002, Darrell Garbacik, the Recreation Director for the Michigan City Department of Parks and Recreation, received a phone call from LaPorte Recreation Director Karl Swihart. Swihart told Garbacik that Mr. Brown previously had been observed at Stone Lake Beach in LaPorte, Indiana,

---

[1] Mr. Brown claims that he watched only women on the beach, *see* Brown Dep., R.49, Tab 3 at 51; the City claims that he also watched children, and that some of the "women" sunbathing on the beach in actuality were "teenage girls," *id.*

sitting in his R.V. and watching beach patrons through binoculars.[2] The LaPorte police were notified and, after an investigation, they discovered that, in 1995, Mr. Brown had been convicted of one count of child molestation.[3] Swihart faxed Garbacik the case report from this investigation. Garbacik subsequently notified the Michigan City Police Department ("MCPD") and the park staff of Mr. Brown's criminal history; he directed the park staff to be on notice of Mr. Brown's whereabouts in the park and to report any unusual behavior.

A picture of Mr. Brown's vehicle subsequently was circulated to parking attendants at the Washington Park gatehouse; they logged Mr. Brown entering and exiting the park daily, sometimes twice daily, from July 16 to July 29, 2002. In addition, staff at a day camp within the park observed Mr. Brown driving slowly by the camp, allegedly watching the children. At his deposition, Garbacik ex-

[2] Specifically, in late June 2002, Mr. Brown was parked near the beach, directly across from a family sitting on the beach. Officer Paul Brettin of the LaPorte City Police Department was on the scene and, having noticed Mr. Brown in his car, inquired of the lifeguards about his presence. The lifeguards informed the officer that Mr. Brown often parked in this same spot and watched beach patrons. Officer Brettin then approached Mr. Brown's vehicle; Mr. Brown explained to the officer that he was at the beach to go swimming. Officer Brettin requested identification, which Mr. Brown willingly provided. The officer subsequently ran a criminal check on Mr. Brown and discovered his criminal history.

[3] For this crime, Mr. Brown was sentenced to six years' imprisonment; three years of his term of imprisonment were suspended, and he was released from prison in January 1999. He was placed on probation for three years and completed a counseling program after his release.

plained that the speed limit on the road in front of the day camp is only ten miles an hour, but nevertheless maintained that Mr. Brown's conduct was unusual:

Q:  [W]hat is the speed limit within the park?

A:  I'd actually be guessing, but I'd have to believe it's ten miles or less . . . .

. . .

Q: So what does it mean to say that Mr. Brown was cruising slowly . . . ?

A: I think the distinction there and what was expressed to me is that most people keep their eyes on the road and stop at the stop sign. This particular individual was looking to his right observing activities going on there.

Garbacik Dep., R.49, Tab 1 at 22. The City acknowledges that, although Mr. Brown's people-watching at the park was in and of itself a largely innocent activity, when combined with his criminal history, it raised a "red flag[]" for the park staff. *Id.* at 38.

   Mr. Brown was approached by Officer Webb of the MCPD while sitting in his R.V. at the park in late July 2002. Officer Webb inquired about Mr. Brown's activities and whether he was bothering anyone; after a short conversation, he allowed Mr. Brown to remain in the park. Mr. Brown again was approached in the park the next day; after asking Mr. Brown what he was doing, Officer Mark Swistek of the MCPD suggested that he leave the park. Mr. Brown complied. A few days later, Mr. Brown was again in Washington Park when he was approached by two officers, who inquired whether Mr. Brown was registered as a sex offender with the MCPD; he responded that he had registered with the Sheriff's Department in LaPorte County, but

was not aware that he also needed to register with Michigan City officials.[4] According to Mr. Brown, the fourth and last time he was approached by the police in the park, the officers were accompanied by a city attorney. The attorney took Mr. Brown's park pass; the officers informed him that he was no longer allowed in the park; if he returned, Mr. Brown was warned, he would be arrested for trespassing. Mr. Brown complied with this order.

On July 31, 2002, an officer of the MCPD hand-delivered a letter to Mr. Brown. It read:

> The banning of your presence from the Michigan City Park properties will be presented to the Michigan City Parks and Recreation Board, Thursday August 1st at 6:00 in the 1st floor of the Park Office.

*Id.*, Ex.5. Mr. Brown affirms that he "knew why [he] was being banned," Brown Dep., *id.*, Tab 3 at 43, but alleges that he did not understand that he was "invite[d]" to the hearing, *id.* at 7. Because the police previously had told him that he would be arrested if he entered the park again and because the meeting was at the Park Office, *inside* Washington Park, he did not believe that he had permission to attend.

A friend of Mr. Brown's, Randolph Sanders, called various city officials to find out more about this meeting; he spoke with the Park Superintendent, to whom he expressed the concern that Mr. Brown would be arrested if he attended the meeting. The Superintendent stated that Mr. Brown was allowed to attend the meeting; however, both the Superin-

---

[4] Subsequently, Mr. Brown promptly completed the necessary paperwork to register as a convicted sex offender with the Michigan City Police Department.

tendent and the city attorney refused Sanders' request to put this assurance in writing.

The Michigan City Parks and Recreation Board met in regular session on August 1, 2002, at the Park Office in Washington Park. In attendance were the four Board members, a number of park staff, press and members of the public. Mr. Brown was not present. One of the items discussed at the meeting was Resolution 548, entitled, "A Resolution Prohibiting the Use of Park Department Properties by an Individual Having a Child Molesting History." *Id.*, Tab 1, Ex.7. In pertinent part, the Resolution read:

> WHEREAS, the Michigan City Parks and Recreation Board and the Michigan City Parks and Recreation Department are by law responsible for the safety of all persons using the Park Department facilities or participating in Park Department programs, and
>
> . . . .
>
> WHEREAS, it was brought to the attention of this Board by the Department staff and the Michigan City Police Department that during the period of a recent summer day camp program for children conducted at Washington Park, an individual, namely, <u>Robert E. Brown</u> . . . , who was recognized by members of the Michigan City Police force as a convicted child molester, was observed by the Police and the Department staff frequenting Washington Park in [a] recreational/ camping vehicle, while having a set of binoculars and a camera in his possession, and
>
> WHEREAS, this Board has determined that in order to discharge its responsibilities of child protection and safety, it is necessary to designate all properties and programs under the jurisdiction of the Department to be

OFF LIMITS to any person who has been convicted of child molesting under Indiana Code, IC 35-42-4-3, or convicted of any other sex crime in which the victim is a child under the age of 18 years, and to ban such person from all Michigan City Parks and Recreation Department properties indefinitely.

NOW THEREFORE, BE IT RESOLVED BY THE MICHIGAN CITY PARKS AND RECREATION BOARD AS FOLLOWS:

(1) That ROBERT E. BROWN . . . is hereby BANNED from all properties or programs operated under the jurisdiction of the Michigan City Department of Parks and Recreation and that in the event said individual is found upon any such property, he shall be considered a trespasser, and shall be removed forthwith, or be subject to arrest for failure to depart the premises.

(2) That all properties and programs operated under the jurisdiction of this Department are hereby declared OFF LIMITS to any person who has been convicted of child molesting under Indiana Code, IC 35-42-4-3, or convicted of any other sex crime in which the victim is a child under the age of 18 years, and in the event that such individual is identified and found upon any such property, he shall be considered a trespasser and shall be ordered to remove himself forthwith, or be subject to arrest for failure to depart the premises. . . .

*Id.* at 1-2. Although the resolution applied to *all* persons convicted of child molestation, the City admits that Mr. Brown was the only individual mentioned in the resolution

or at the Board meeting as "being a sex offender in the parks." Garbacik Dep., *id.*, Ex.1 at 32.

The resolution was presented to the Board by Park Department Attorney Patrick Donoghue. Donoghue informed the persons in attendance that Mr. Brown had been involved in a "series of incidents . . . involving the safety and protection of children." Minutes, *id.*, Ex.6 at 2. He explained that Mr. Brown has a criminal record, had been seen using binoculars to watch a family at a LaPorte beach, and had been observed engaging in suspicious behavior in Washington Park, including visiting the park "everyday, sometimes twice a day," watching people from "his vehicle with binoculars and a camera on one occasion," and, on numerous occasions, "driving by very slowly" the children's day camp. *Id.* at 3. He classified the Board's obligation as "about as extreme as [it could] possibly be," given the Board's responsibility for the "care, custody and safety of [children who visit the park]." *Id.* Resolution 548 passed unanimously.

After this litigation was filed on August 13, 2002, the Board reconvened in a special session on August 29, 2002. At this meeting, which again was held in the Park Office and of which Mr. Brown received no notice, Donoghue recommended to the Board that they rescind Resolution 548 and instead pass Resolution 552, entitled, "A Resolution Prohibiting the Use of Park Department Properties by an Individual Having a Child Molesting History, Whose Observed Behavior Constitutes a Threat to the Safety of Children." *Id.*, Ex.9. The Resolution is similar in substance to Resolution 548; the difference is that, instead of making Michigan City park properties "OFF LIMITS to *any person* who has been convicted of child molesting under Indiana Code, IC 35-42-4-3, or convicted of any other sex crime in

which the victim is a child under the age of 18 years," *id.*, Ex.7 at 1-2 (emphasis added), it makes those properties and park programs "OFF LIMITS to the said Mr. Robert E. Brown who has been convicted of child molesting under Indiana Code, IC 35-42-4-3, and whose observed behavior in Washington Park is deemed by this Board to constitute a threat to the safety of children," *id.*, Ex.9 at 1-2. Under the resolution, Mr. Brown is banned from "all Michigan City Parks and Recreation Department properties indefinitely." *Id.* at 2. Donoghue explained the change to the Board members and other members of the public present at the meeting as prompted by the motion for class certification filed by Mr. Brown. Because the "immediate problem to be addressed is Mr. Brown," and the issue of other persons convicted of child molestation is "more remote," Donoghue urged the Board to "adopt [the new] resolution and rescind Resolution 548. . . . [O]ur Resolution No. 548 must be 'narrowly tailored' and it is 'narrowly tailored' if it targets and eliminates no more tha[n] the exact source of evil it seeks to remedy." *Id.*, Ex.8 at 2. The Board voted unanimously to rescind Resolution 548 and to adopt Resolution 552.

## B. District Court Proceedings

On August 13, 2002, Mr. Brown brought this action against the City of Michigan City in the District Court for the Northern District of Indiana; at the same time, he filed in the district court a motion for class certification. Mr. Brown alleged that he, and the other individuals banned from entering Michigan City parks by Resolution 548, had been deprived of a protected liberty or property interest without due process of law. Specifically, he claimed that notice of the August 1st Board meeting was not timely

received; further, he claimed that he was deprived of an opportunity to be heard because he previously was told that, if he entered the park, as was necessary to attend the meeting, he would be arrested. Mr. Brown also alleged a violation of his and the class' substantive due process rights, claiming that the right to enter public spaces like city parks is a "fundamental and basic right of plaintiff and the class" and that the decision to ban the class from city parks was "arbitrary and irrational." R.1 at 6. Mr. Brown sought on behalf of the class a declaratory judgment and a permanent injunction, allowing the class to lawfully enter Michigan City parks; he also sought compensatory damages and attorneys' fees.[5]

After Resolution 548 was rescinded and Resolution 552 passed, Mr. Brown amended the complaint, naming himself as the sole plaintiff; he subsequently also withdrew his motion for class certification.

On September 19, 2005,[6] the district court granted summary judgment in favor of the City. First, with regard to Mr. Brown's procedural due process claim, it found that Mr. Brown did not have a protected property interest in being permitted to enter Michigan City's parks. It rejected the claim that "his resident pass and his ability, like that of other members of the public, to enter and use the City's parks amounted to an understanding or entitlement that

---

[5] The complaint also alleges a violation of the Ex Post Facto Clause of Article I, § 10, and the Fifth Amendment Double Jeopardy Clause. These claims have not been pursued on appeal.

[6] The case was stayed pending a decision in *Doe v. City of Lafayette,* 334 F.3d 606 (7th Cir. 2003); a second stay was issued when this court voted to rehear *Doe* en banc, *see* 377 F.3d 757 (7th Cir. 2004).

created a property interest." R.54 at 9 (internal quotation marks omitted). Further, because Mr. Brown still could enter other public places in Michigan City and because he still may visit other parks outside of Michigan City's municipal boundaries, any infringement was de minimis. The court also rejected Mr. Brown's claim of a liberty interest, based on damage to his reputation. Although the "labeling of Mr. Brown as a threat to children may have resulted in damage to his reputation," *id.* at 11, under the "stigma plus" test of *Paul v. Davis*, 424 U.S. 693, 708-09 (1976), he also needed to establish "the alteration of a legal status," R.54 at 12. This, the district court concluded, Mr. Brown had not done:

> [T]he burden on his right to enter Michigan City's parks . . . doesn't impede his ability to enter and use other public places in Michigan City or enter and enjoy public parks in other locales . . . . Mr. Brown hasn't cited an Indiana law establishing a right to enter Michigan City parks or cited to any case law supporting his claim of such an entitlement.

*Id.* at 13.

Even if he did have a protected property or liberty interest, the court continued, Mr. Brown received the process he was due. He received adequate notice. *See id.* at 15 ("Mr. Brown hasn't set forth any circumstances to support a finding that 24-hours was insufficient."). He was given an opportunity to be heard. *Id.* at 17 (holding that Mr. Brown's belief that he would be arrested if he entered the park was unreasonable, given that "he learned through [Sanders'] calls that he *could* attend the meeting, albeit without the written guarantee he sought" (emphasis added)). And the hearing was fair: Although the Board did not conduct a full adversarial hearing, "an open discus-

sion was held, and questions were accepted and answered." *Id.* at 18.

Lastly, the district court found that Mr. Brown had not been deprived of a "fundamental right to enter public spaces like city parks," guaranteed by the Due Process Clause. *Id.* at 23. The "right to enter and use city parks" is not fundamental. *Id.* (citing *Doe v. City of Lafayette,* 377 F.3d 757, 772-73 (7th Cir. 2004)). Further, the City's actions easily passed muster under rational basis review: The City's ban of Mr. Brown "is rationally related to its compelling interest in safeguarding children in its parks." R.54 at 25.

Mr. Brown timely appealed.

## II

## DISCUSSION

Mr. Brown contends on appeal that the district court erred in granting summary judgment to the City on his procedural due process claim. He submits that he was deprived of property when he was "stripped of the tangible symbol of his right to enter [Michigan City] parks, his park pass," Appellant's Br. at 18; he allegedly was denied a liberty interest when he was labeled by the City "a threat to the safety of children," *id.* at 20 (internal quotation marks omitted). He further submits that he was not afforded adequate process by the City: he received no notice of the August 29, 2002 meeting; the notice received of the earlier August 1 meeting was constitutionally inadequate; the meetings involved "no fact-finding, testimony, or adjudication," *id.* at 30; and the City's decision to ban him from its parks "was not made pursuant to ascertainable standards," *id.* at 23.

Mr. Brown also contends that the district court erred in dismissing his substantive due process claim. According to Mr. Brown, he has a fundamental right to "enter parks and wander and loiter there," and, although the Government admittedly has a compelling interest in protecting children from the threat of molestation, he argues that the Government cannot prove that the ban is rationally related to that interest. *Id.* at 32.

We review the district court's grant of summary judgment de novo*. See Sornberger v. City of Knoxville*, 434 F.3d 1006, 1012 (7th Cir. 2006). In doing so, we must construe all facts and reasonable inferences in the light most favorable to the non-moving party. *See id.* Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## A. Procedural Due Process

A procedural due process claim requires a two-fold analysis. First, we must determine whether the plaintiff was deprived of a protected interest, either liberty or property; second, we must determine what process is due. *See Pugel v. Bd. of Trs. of Univ. of Illinois*, 378 F.3d 659, 662 (7th Cir. 2004). To determine the "specific dictates of due process," the Supreme Court has advised that we should consider

> three distinct factors: First, the private interest that
> will be affected by the official action; second, the risk of
> an erroneous deprivation of such interest through the
> procedures used, and the probable value, if any, of

additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). With this framework in mind, we turn to Mr. Brown's claim that he was deprived of a protected property or liberty interest.

### 1. Property Interest

To claim a property interest protected by the Fourteenth Amendment, "a person . . . must have more than a unilateral expectation of [the claimed interest]. He must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Id.; see also Perry v. Sinderman*, 408 U.S. 593, 601 (1972) (holding that a property interest also can be created through less formal rules or through "mutually explicit understandings").

In this case, we must decide whether the tradition of distributing free park passes to Michigan City residents created a legitimate expectation of the continued right to visit Washington Park. We sympathize with Mr. Brown's situation: The City, by banning him from its parks, took from him a daily routine that seems to have brought him great joy and one of the few activities he shared with his wife before she died. As Mr. Brown explained in his deposition:

[Visiting Washington Park is] just something I've been doing since way back. I've been coming up to Michigan

> City when I was a teenager. . . . [T]he wife and I was going down there for awhile.

> It's just a place where I can go and relax and see people enjoying life, which is something I haven't done since my wife died.

Brown Dep., R.49, Tab 3 at 78-79.

We cannot conclude, however, that Michigan City's practice of opening its parks to its residents free of charge created a constitutionally cognizable property interest, which was violated when Mr. Brown was banned from those parks. A property interest of constitutional magnitude exists only when the state's discretion is "clearly limited" such that the plaintiff cannot be denied the interest "unless specific conditions are met." *Colburn v. Trs. of Indiana Univ.,* 973 F.2d 581, 589 (7th Cir. 1992) (discussing the plaintiff's property interest in continued employment). Mr. Brown cannot point to a state law, or another independent source, that *guarantees* him access to Washington Park. In fact, the Indiana Code grants municipal parks and recreation boards, like the Michigan City Parks and Recreation Board, the authority to "exercise general supervision of and make rules for the department[] [and] establish rules governing the use of the park and recreation facilities by the public[.]" Ind. Code § 36-10-3-10(a)(1), (2) (1999). Under the power granted to it by § 36-10-3-10, the Michigan City Parks and Recreation Board ultimately possesses discretion to decide whether and under what conditions members of the public can access the City's parks.

These circumstances are similar to those presented in *Glatt v. Chicago Park District,* 87 F.3d 190 (7th Cir. 1996). In *Glatt*, an owner of a yacht protested his reassignment from slip D19 in Chicago's Diversey Harbor to slip D5; he contended

that he had a valid property interest in slip D19. We rejected
this claim. Because the "Marine Director is given uncabined
discretion to change a permit holder's harbor or slip
whenever the director thinks that the change is necessary
because of 'efficiency,' " we held that the plaintiff could not
claim a property interest in a particular slip. *Id.* at 192
(concluding that "[t]he words 'property' and 'entitlement'
connote an interest that is securely, though not absolutely,
the holder's"). Because the right to enter the City's parks
also is not "securely" Mr. Brown's, *id.*, it cannot be claimed
as a valid property interest.

Because we do not believe that Mr. Brown can claim a
property interest in accessing the parks of Michigan City,
we need not determine whether he has a property inter-
est that could be termed de minimis and whose depriva-
tion would not warrant due process. *See Omosegbon v. Wells*,
335 F.3d 668, 674 (7th Cir. 2003) (holding that, to establish a
constitutionally protectable property interest, the plaintiff
must establish that his interest is "more than *de minimis,*
which typically calls on the plaintiff to demonstrate some
form of provable . . . harm"); *see also Freeman v. Sports Car
Club of America, Inc.*, 51 F.3d 1358, 1363 (7th Cir. 1995)
(holding that the plaintiff did not have a valid property
interest in his racing license because it implicated only
"amateur racing, a hobby," and noting that, "[i]f [the
plaintiff] did not want to play by the [racing club's] rules[,]
his proper recourse was to race elsewhere").

### 2. Liberty Interest in Reputation

Mr. Brown also contends that Michigan City's actions
implicate a constitutionally protected liberty interest.
According to Mr. Brown, the City damaged his reputa-

tion by classifying him as a "present threat" to children; this, coupled with the alteration of his legal status, warrants procedural due process under the "stigma plus" framework of *Paul v. Davis*, 424 U.S. 693 (1976). Appellant's Br. at 21-23. The district court rejected this argument; it held that, although the City's statements may have damaged his reputation, Mr. Brown had not demonstrated the alteration of his legal status, as required by the "stigma plus" test.

*Paul v. Davis* recognized that "mere defamation by the government does not deprive a person of liberty protected by the Fourteenth Amendment, even when it causes serious impairment of [one's] future employment." *Hojnacki v. Klein-Acosta*, 285 F.3d 544, 548 (7th Cir. 2002) (internal quotation marks omitted and alteration in original) (discussing *Paul v. Davis*, 424 U.S. at 697, 708-09). Rather, it is only the "alteration of legal status," such as the governmental deprivation of a right securely held, "which, combined with the injury resulting from the defamation, justifie[s] the invocation of procedural safeguards." *Paul*, 424 U.S. at 708-09.

To be sure, the statements made about Mr. Brown at the August 1st and August 29th Board meetings probably could be classified, if untrue, as defamatory because they had and may continue to have the potential to "injure his . . . reputation" and are "capable of being proved false." *Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004) (internal quotation marks omitted). Although the majority of statements made by city representatives at the two meetings were truthful,[7] we can assume for present pur

---

[7] *See, e.g.,* R.49, Tab 1, Ex.6 at 3 (accurately describing Mr. Brown's activities at Washington Park, including visiting the park

(continued...)

poses that some of the statements made were false. More-over, as a direct result of publicity about Board proceedings, Mr. Brown was harassed publicly and his R.V. was vandal-ized. *See* Brown Dep., R.49, Tab 3 at 34 (noting that vandals knocked windows out in his motor home); *id.* at 65 (discuss-ing the connection between this incident and publicity surrounding the Board's actions). We further can assume for purposes of this analysis that these statements "cast[] doubt on [Mr. Brown's] good name, reputation, honor or integ-rity," fulfilling the first prong of the *Paul v. Davis* "stigma plus" test. *Dupuy v. Samuels,* 397 F.3d 493, 503 (7th Cir. 2005) (internal quotation marks omitted).

We agree, however, with the district court that Mr. Brown cannot fulfill the "plus" factor of the *Paul v. Davis* test—the alteration of legal status. For a plaintiff to establish a protectable liberty interest, "any stigmatic harm must take concrete forms and extend beyond mere reputational interests." *Omosegbon*, 335 F.3d at 675. The defamatory statements must "alter[] or extinguish[ ]" "a right or status previously recognized by state law." *Paul,* 424 U.S. at 711; *see also id.* at 712 (holding that the plaintiff's placement on a list of active shoplifters did not alter his legal status because it did not "work[] any change of [his] status as theretofore recognized under the State's laws"). For example, we have recognized the violation of a valid liberty interest when "[an] employee's good name, reputation, honor or integrity [was] called into question in a manner that ma[de] it virtually impossible for the employee to find new employ-ment in his chosen field," *Townsend v. Vallas*, 256 F.3d 661,

---

[7]  (...continued)
"everyday, sometimes twice a day," and "sitting in his vehicle with binoculars").

670 (7th Cir. 2001); *see also Beischel v. Stone Bank Sch. Dist.*, 362 F.3d 430, 439 (7th Cir. 2004) (same); when a student was deprived of the right to attend public school, *see Paul,* 424 U.S. at 710 (discussing *Goss v. Lopez*, 419 U.S. 565 (1975)); and when a plaintiff's right to operate a vehicle on the highways of the state was taken away, *Paul,* 424 U.S. at 711 (discussing *Bell v. Burson*, 402 U.S. 535 (1971)).

Mr. Brown cannot establish that the right to enter the parks of Michigan City is "a right or status previously recognized by state law." *Paul,* 424 U.S. at 711. The cases cited by Mr. Brown, *see, e.g., Gen. Outdoor Adver. Co. v. City of Indianapolis, Dept. of Pub. Parks,* 172 N.E. 309, 313 (Ind. 1930), indeed do discuss the importance of public parks; however, they do not confer a constitutionally cognizable right upon all citizens to enjoy these parks unconditionally. In fact, as we already have discussed, the right to enter Michigan City parks is qualified by Indiana state law, which grants discretion to the Park Board to set conditions on the public's entry to city parks and to regulate the behavior required of its visitors. *See* Ind. Code § 36-10-3-10(a)(2) (1999). The cases cited by Mr. Brown in support of a contrary conclusion are inapposite. For example, he relies on *Wisconsin v. Constantineau*, 400 U.S. 433 (1971). In *Constantineau*, the Supreme Court held that a one-year ban on the plaintiff's purchase of alcohol in Hartford, Wisconsin, was invalid because no notice was given and no hearing held; the Court found that the stigma of being banned publicly from a liquor store constituted the denial of a liberty interest. *See id.* at 436. In *Paul v. Davis*, the Court held, however, that stigma alone does not establish the deprivation of a constitutionally protectable liberty interest; instead, the plaintiff also must establish the alteration of legal status. *See Paul v. Davis*, 424 U.S. at 701-02 (refusing to overturn *Constantineau* but clarifying that "the correct

import of [the *Constantineau*] decision . . . must be derived from an examination of the precedents upon which it relied, as well as consideration of the other decisions by this Court, before and after *Constantineau*, which bear upon the relationship between governmental defamation and the guarantees of the Constitution"). Accordingly, *Constantineau* has been limited by this circuit to its precise facts; as we explained in *Health Equity Resources Urbana, Inc. v. Sullivan*, 927 F.2d 963 (7th Cir. 1991), *Paul* reinterpreted *Constantineau* to recognize a state law entitlement to freely "purchase goods," an entitlement not at issue in this case.[8] *Id.* at 968.

---

[8] In his reply brief, Mr. Brown also cites *Somerset House, Inc. v. Turnock,* 900 F.2d 1012 (7th Cir. 1990), for the proposition that his ban from Michigan City parks affected a change in his legal status. In *Somerset*, the plaintiff, a nursing home in Chicago, was found by the Illinois Department of Public Health to have committed a violation of the Nursing Home Care Reform Act, Ill. Rev. Stat. ch. 111 1/2, ¶ 4151-101, et seq. (1988), and was issued a "Conditional License"; the Conditional License caused the Illinois Department of Public Aid to automatically withdraw funding under the Quality Incentive Program, Ill. Admin. Code tit. 89 § 140.565 et seq., until the temporary license expired. The plaintiff brought suit against the Directors of the Illinois Department of Public Health and the Department of Public Aid, alleging that it was deprived of property without due process of law. The district court held that the plaintiff had a significant protectable interest under the "stigma plus" analysis. On appeal, the defendant did not challenge whether the plaintiff had a constitutionally protected property or liberty interest and, therefore, contrary to Mr. Brown's suggestion, we had no occasion to address the issue. Even had we affirmed the district court's analysis, that analysis is not applicable to the present case: The district court in *Turnock* held that the loss of eligibility for Quality Incentive

(continued...)

We therefore find no alteration of legal status and, consequently, no deprivation of a protectable liberty interest.

Whether Mr. Brown was afforded adequate process in this case is a difficult question. Because we conclude that Mr. Brown was not deprived of a valid liberty or property interest, however, we have no occasion to address definitively what process was due and whether the process afforded was adequate under the circumstances.

## B. Substantive Due Process

Mr. Brown also contends that the City violated his right to substantive due process when it banned him from entering its public parks. As the Supreme Court has noted,

> the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed . . . . Our Nation's history, legal traditions, and practices thus provide the crucial guideposts for responsible decisionmaking, that direct and restrain

---

[8] (...continued)

Program funding, a program created and administered by state law, constituted a "change in legal status." *Id.* at 1015 (describing the holding of the district court). The same is not true here. Unlike in *Turnock*, where under the terms of state law the plaintiff *was* eligible for state funding and therefore was guaranteed due process before such eligibility was withdrawn, there is no state law or similar source that guarantees Mr. Brown access to Michigan City parks.

our exposition of the Due Process Clause. As we stated recently in *Flores,* the Fourteenth Amendment forbids the government to infringe . . . fundamental liberty interests *at all,* no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.

*Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (internal citations and quotation marks omitted; emphasis and second alteration in original). The Supreme Court, however, has advised that we must be

reluctant to expand the concept of substantive due process because guideposts for responsible decision-making in this unchartered area are scarce and open-ended. By extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action. We must therefore exercise the utmost care whenever we are asked to break new ground in this field . . . .

*Id.* at 720 (internal citations and quotation marks omitted). As a result, there is only a narrow category of recognized "fundamental" rights. They include:

the rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion[.] We have also assumed, and strongly suggested, that the Due Process Clause protects the traditional right to refuse unwanted lifesaving medical treatment.

*Id.* (internal citations omitted).

The right to enter a public park is not among this list. In fact, in *Doe v. City of Lafayette*, 377 F.3d 757 (7th Cir. 2004),

we explicitly refused to expand the list of fundamental liberties to include a right to enter city parks. In *Doe*, the plaintiff previously had been convicted of child molestation. While on probation, he reportedly was seen "cruising parks and watching young children." *Id.* at 759 (internal quotation marks omitted). He later received notice from the City of Lafayette, Indiana, that he had been banned from entering its public parks. Doe challenged this ban, alleging, in pertinent part, that he had been deprived of a substantive due process right recognized by the Fourteenth Amendment.

We classified Mr. Doe's alleged "right to enter the parks to loiter or for other innocent purposes" as one that, although certainly important, is not "fundamental." *Id.* at 769-70. "It certainly is an uncomfortable fit with the liberty interests that the Supreme Court, as noted in *Glucksberg,* has determined to be fundamental," *id.* at 770, including the right to marry, to marital privacy and to use contraception:

> When we compare Mr. Doe's asserted liberty interest with those which have been held fundamental, we are bound to the conclusion that Mr. Doe's asserted right to enter the parks to loiter is not on the same footing; it is not implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [it] were sacrificed. . . . The historical and precedential support for a fundamental right to enter parks for enjoyment is, to put it mildly, oblique. Notably, Mr. Doe's argument contains a dearth of historical sources. He cites no case, state or federal, that has held that the right to enter the park to loiter or for other enjoyment purposes is "fundamental," as that term is understood in substantive due process doctrine.

*Id.* at 770-71 (internal citations and quotation marks omitted; first alteration in original). Because no fundamental right was at stake, we applied a rational basis standard of review. We found that the City's interest in protecting children is "not merely legitimate, [but] compelling." *Id.* at 773. We also found that the ban was rationally related to that end: Mr. Doe had been witnessed in the park looking at children; he was a convicted child molester; and it was possible that he was heading down a "slippery slope into abuse." *Id.*

Mr. Brown does not challenge *Doe*'s conclusion that the right to enter a park is not fundamental. We therefore "must ask whether the ban is rationally related to a legitimate government interest, or alternatively phrased, whether the ban is arbitrary or irrational." *Id.* at 773 (internal quotation marks omitted). Mr. Brown does not contest that the City's interest in protecting children from potential child abusers is "legitimate." *Id.* He does claim, however, that this ban is not rationally related to that end. Unlike in *Doe*, he urges, where the plaintiff was observed engaging in behavior "threatening [and] dangerous" to children, Mr. Brown's behavior was largely benign: He merely sat alone in his R.V., observing patrons on the beach and in the park. Appellant's Br. at 33.

We cannot accept this argument. Rational-basis review is "highly-deferential." *Turner v. Glickman*, 207 F.3d 419, 426 (7th Cir. 2000). To find that a government action violates the requirements of substantive due process in this context, it must be "utterly lacking in rational justification." *Id.* (internal quotation marks omitted). In this case, Michigan City park personnel received reports that Mr. Brown had been sitting in his van, watching beach patrons through binoculars; he came to Washington Park once or twice daily; he previously had been seen at a nearby beach watching a

family; and he has a criminal record for molesting a child. Of course, there are significant differences between Mr. Brown and the plaintiff in *Doe*; for example, there is no evidence that Mr. Brown was "[l]ooking for children" or "having . . . urges" while watching children at the park. *Doe*, 377 F.3d at 759-60 (quoting Mr. Doe's admissions). Nor can we conclude on the basis of the record before us, as we did in *Doe,* that Mr. Brown necessarily is heading down a "slippery slope into abuse." *Id.* at 773. Nevertheless, the reality is that "children, some of the most vulnerable members of society, are susceptible to abuse in parks," *id.*, and that the City has a duty to shield them, ex ante, from the *mere risk* of child abuse or molestation. The ban of Mr. Brown from the City's parks bears a rational relationship to its goal of protecting the children of its community. As a practical matter of ensuring public safety, Mr. Brown is not just another patron of the public parks. He is a convicted child molester whose frequency of attendance and atypical behavior while in the park justified the concern of those public officials charged with ensuring the safety of members of the public who visit the recreational site.

Mr. Brown responds that, because Michigan City has not chosen to ban *all* child molesters from its parks, only Mr. Brown, its actions are "fundamentally irrational." Appellant's Br. at 34. But the City's means need not be "narrowly tailored" to its goals; rather, they need only be "reasonably related to [those] goal[s]." *City of Chicago v. Shalala*, 189 F.3d 598, 607 (7th Cir. 1999). Unlike other persons previously convicted of child molestation, Mr. Brown was witnessed repeatedly in Washington Park watching patrons through binoculars; there is no indication that park officials had seen other sex offenders on City property, engaged in activity similar to Mr. Brown's. Further, as we concluded in *Doe*, "[t]here is certainly

nothing in the record to suggest the City would act differently when faced with a similar case." *Doe*, 377 F.3d at 773 n.14.[9]

## Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the district court.

AFFIRMED

---

[9] Mr. Brown also contrasts his case with that of Willie Faulkner, the only other individual to have been banned from Michigan City parks. Faulkner was "observed with his hands in his pants," watching a female high school volleyball team. Garbacik Dep., R.49, Tab 1 at 8. In August 2002, he was banned from entering Michigan City parks "for the remainder of the 2002 and for the entire 2003 calendar year." Letter to Faulkner, R.49, Tab 1, Ex.2. Mr. Brown submits that it is irrational to impose an indefinite ban on his entry to the City's parks when Faulkner was banned, for comparatively more threatening conduct, for only two years. This comparison is persuasive, but ultimately unavailing. Although we agree that Faulkner's conduct can be characterized as less benign than Mr. Brown's, there is no evidence that Faulkner formerly was convicted of child molestation. It is not unreasonable for the City to treat an individual who has demonstrated a propensity towards molesting children differently than an individual with no record, in the event that both are engaged in suspicious activity.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*