In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 06-4274

CHRISTOPHER MCMAHON,

*Plaintiff-Appellant,*

*v.*

JOHN KINDLARSKI, JOHN NIEBUHR,,
RONALD DEBRUYNE, SR., et al.,

*Defendants-Appellees.*

---

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 06 C 285—**John C. Shabaz,** *Judge.*

---

ARGUED NOVEMBER 5, 2007—DECIDED JANUARY 15, 2008

---

Before POSNER, EVANS, and SYKES, *Circuit Judges.*

EVANS, *Circuit Judge.* In this suit, brought under 42 U.S.C. §§ 1983 and 1985, Christopher J. McMahon claims that Vilas County (Wisconsin) Sheriff John Niebuhr and Deputy Sheriff John Kindlarski conspired with Kristen DeBruyne and her parents, Ronald and Judith DeBruyne, to violate his rights under the Fourteenth Amendment to the Constitution. He also alleges various violations of state law. The district court granted the defendants' motions for summary judgment and McMahon appeals.

The rules regarding our review of summary judgment decisions are well-known and need not be repeated here.

But suffice to say that this case presents multiple varia-tions on the details, on which we defer to McMahon's version as he was the nonmoving party on the summary judgment proceedings in the district court. But that said, we note that no one is really covered in glory in the case, and the tragedy is that the young child at the center of the controversy has been badly used by people who should be protecting her. Were it not for her, this case would be grist for an awful soap opera on daytime network television.

Our story begins in April 2001 when McMahon, then 26 years old, had a sexual fling with Kristen DeBruyne. Not only was DeBruyne 17 years old, she has, at some point, been diagnosed with bipolar disorder, post-trau-matic stress disorder, and a personality disorder. There is a dispute about how long the McMahon/DeBruyne relationship lasted. McMahon says it was about a week. Whatever its length, it caused years of trouble. By May, DeBruyne told McMahon that she was pregnant. By September, McMahon was showing interest in the preg-nancy, and DeBruyne and her family started a vicious campaign to prevent him from ever having anything to do with the baby. Kristen informed McMahon that the baby was hers and he should go out and get one of his own. McMahon told her he was going to file a paternity action. In November, Kristen's mother, Judith, made a harassment complaint against McMahon, who very soon heard, for the first of many times, from Deputy Kindlarski.

When Kristen DeBruyne's parents took action, it was Judith who took the lead. Ron DeBruyne, Kristen's father, was on the county board in Vilas County and on its Law Enforcement Committee. That committee had oversight over the sheriff's budget. Some years later, Ron said he stayed in the background because he was concerned about appearances. He acknowledged discussing matters with his wife and generally agreeing with what she was doing

as this mess played out. He told a therapist who interviewed him for a custody action that if he were not concerned about appearances he would go sit on the desks of the Oneida and Vilas County police and find out why they were not doing enough about the case. To others, it might seem like the authorities were overly eager to do Judith DeBruyne's bidding.

But back to the story. Also in November, Kristen DeBruyne, now apparently 18 years of age, married another man, Michael Ervin. The baby, named Kathy,[1] was born in January. In that same month, McMahon had Kristen served with papers in a paternity action. Soon thereafter, in February of 2002, DeBruyne and her husband moved to Libertyville, Illinois. In March, Natalie Tyler was appointed guardian ad litem for Kathy in the paternity case. Tyler told McMahon that DeBruyne was calling him a rapist, which would make it hard for the court to let him see the baby. But, in June, a judge in Oneida County, Wisconsin, where the paternity suit was pending, ruled that there would be genetic testing done to determine paternity; the testing proved that McMahon was Kathy's father.

Allegations of child abuse and rape began swirling around. In November 2002, McMahon filed a complaint with the social services agency in Libertyville, based on information he obtained from an Internet chat site. On the site, which McMahon stayed on for many months assuming a false female identity—"bluekellylilly," a single mother—he chatted with DeBruyne. Finally, after 9 months, Kristen acknowledged slapping Kathy. McMahon used the admission against Kristen. He also told

---

[1]  "Kathy" is not the baby's real name. We decline to name her because we hope, when she grows up, she will never read about this horrible case.

Libertyville officials that he had saved the e-mails, and on December 13, 2002, he turned his computer over to a neighboring police department so that an investigator could check it out. Unfortunately for him, the investigator found 12 images of what he considered child pornography. Suspiciously, however, the images were downloaded to the computer on December 11, at a time when McMahon was not home.

During this time, DeBruyne and her mother were interviewed by a social worker with the Vilas County Social Services Agency. They accused McMahon of being a stalker and a rapist. In January 2003, Judith DeBruyne told Kindlarski that McMahon raped her daughter. Kindlarski interviewed Kristen DeBruyne's therapist, who said that Kristen had told her some time earlier that McMahon had sexually assaulted her. Kindlarski also interviewed Ervin and told him that Kristen had been sexually assaulted by both McMahon and his brother. Later, Kristen said she had not been assaulted.

Adding fire, the Libertyville police told Kindlarski about the child pornography and sent him copies of the images. In investigating the allegations, Kindlarski prepared an affidavit in support of a subpoena for McMahon's records from the University of Wisconsin-Eau Claire computer network, a network that McMahon, a student at UW-Eau Claire, frequently used. Kindlarski then met with Dean Robert Shaw at UW-Eau Claire to serve the subpoena. When Shaw was reluctant to produce the documents, Kindlarski explained that he was investigating an allegation of sexual assault involving McMahon. In fact, at some point, Kindlarski told UW-Eau Claire officials that McMahon was a rapist. Kindlarski also investigated McMahon's run-ins with the university police.

Kindlarski interviewed McMahon at the Eau Claire sheriff's department. Kindlarski first told McMahon the

interview would involve the rape allegations, but then he also asked about the child pornography. This was the first time McMahon learned that child pornography was found on his computer. The Eau Claire County district attorney declined to press charges involving the possession of child pornography.

But that was not the end of the matter. In June 2003, at a hearing in the paternity action, the attorney for Judith and Ron DeBruyne attempted to introduce the images into evidence. Kindlarski was present in court, images in hand. Also, a year later, in an affidavit to be used on the custody issue, Kindlarski stated that there was probable cause to believe that McMahon was in possession of child pornography and that the police investigation was continuing.

Then, in December 2004, Judith DeBruyne told Kindlarski that McMahon had sexually molested little Kathy. Kindlarski told Judith to have Kathy examined. He also informed the guardian ad litem about the abuse allegations. Ultimately, the case was closed due to lack of evidence. But again in 2005, Judith DeBruyne had Kathy examined for sexual abuse a number of times, in fact so many times that the state trial judge in the custody case concluded that the examinations were harming the child.

As one can imagine, all of this caused McMahon problems. He says that after Kindlarski told officials at UW-Eau Claire that he was a rapist and was being investigated for possessing child pornography, the dean said he should leave the school immediately. Furthermore, McMahon was an intern in the Safe and Sound program run through the Eau Claire police department. His internship was terminated. McMahon began attending the University of Wisconsin-Stevens Point. He also obtained an internship with the Lac du Flambeau Indian Welfare Center, but when he arrived at the center one day in

June 2004, he was fired and physically escorted out of the building. His supervisor said that Kindlarski told her that McMahon was a rapist, child pornographer, stalker, and harasser.

The state court custody proceedings went to trial in December 2005. The judge's findings and conclusions clearly reveal his take on the situation. He set out the three allegations he had to consider: that McMahon sexually assaulted Kristen DeBruyne, that he possessed child pornography, and that he sexually assaulted his daughter. The judge found that the sexual encounters between McMahon and DeBruyne were consensual. In fact, at an earlier hearing, in October 2005, Kristen DeBruyne stated that McMahon did not rape her and that their sexual encounters were consensual. The judge also found the allegations of abuse of the child unconvincing and, further, that the repeated examinations of her instigated by Judith DeBruyne were not in the child's best interests. As to the child pornography, the judge chastised McMahon for looking at images, but concluded that 12 images did not make him a pedophile. Further, he found it "suspicious how the sequence of events unfolded in that Mr. McMahon had 12 images downloaded onto his computer hours after the social worker spoke to the DeBruyne's concerning Mr. McMahon's report of Kristen being physically abusive to the child. The Court finds that this is more than a little coincidental." All in all, though there was blame to go around, the judge accepted the recommendation of the guardian ad litem and granted full custody of Kathy to McMahon.

Finally, McMahon graduated from UW-Stevens Point in the spring of 2005 with a degree in social work. He obtained a position as a social worker with Forward Service, where he remains employed. So, in short, he gained custody of his daughter, graduated from college, and obtained employment. The downside of these suc-

cesses is that they doom his case. Our *de novo* review of the district court decision to grant summary judgment convinces us that the case was properly dismissed.

McMahon claims that his due process rights, based on a liberty interest in his occupation and his right to familial association, were violated. He also presents a substantive due process claim based on familial relations.

As to his liberty interest in his occupation, he claims that the defendants' conduct prevented him from working in the field of his choosing. There is also an implication that somehow he was prevented from finishing his degree in education at UW-Eau Claire.

A procedural due process claim requires a two-fold analysis. First, we must determine whether the plaintiff was deprived of a property or a liberty interest. *Brown v. City of Michigan City, Indiana*, 462 F.3d 720 (7th Cir. 2006). McMahon's claim is for a liberty interest. If he has such an interest, then we move to the second step, a determination of what process is due. *Id.*

McMahon claims he was defamed by Kindlarski at the behest of the DeBruynes. But it is well-established that mere defamation, while it may be the basis for a solid claim based on state law, does not deprive a person of liberty protected by the Fourteenth Amendment. *Paul v. Davis*, 424 U.S. 693 (1976). This is true even when the defamation causes serious impairment of future employment opportunities. *Hojnacki v. Klein-Acosta*, 285 F.3d 544 (7th Cir. 2002). To find a violation of a constitutionally protected liberty interest in a situation where the state actor is the employer, a plaintiff-employee would have to show that the defendants called into question his "good name, reputation, honor or integrity" in a way that made it "virtually impossible for the employee to find new employment in his chosen field." *Townsend v. Vallas*, 256 F.3d 661, 670 (7th Cir. 2001).

Nothing less would be required in a situation like the one we are dealing with here.

All McMahon contends is that he had to leave UW-Eau Claire because Kindlarski told the dean bad things about him. He also says, basically, that he did not think he could get a job in education, so when he went to UW-Stevens Point he changed majors. His claims are simply too vague to establish the deprivation of a liberty interest. He does not say he was expelled from UW-Eau Claire or from its education department. He does not know for certain that he could not get a job in education because of what Kindlarski did. He did not try to study education or to get a job in education. In addition, he obtained employment in what can only be considered a related field and, at least at the time of the briefing in this case, he was still employed. He has simply failed to establish a deprivation of a liberty interest.

For that reason, we need not consider whether state remedies available to him are adequate. But it must be said that, from where we stand, it seems that the facts he alleges fit best into a state claim for defamation.

McMahon may come closer to establishing a substantive due process right or a procedural liberty interest in familial associations, but even if he does, it is not possible to find a violation of those rights. Kathy was born while her mother was married to another man. In such a situation, when the biological father and the child have not been "treated as a protected family unit under the historic practices of our society," the Supreme Court has said that there is no fundamental right to a parental relationship. *Michael H. v. Gerald D.*, 491 U.S. 110, 124 (1989). But the Supreme Court, while making clear that biology is not enough to confer a constitutional right on a putative father, has looked to other factors to see whether there is a protectable right. In *Lehr v. Robertson*, 463 U.S. 248, 261 (1983), the Court said:

> When an unwed father demonstrates a full commit-
> ment to the responsibilities of parenthood by "com[ing]
> forward to participate in the rearing of his child,"
> *Caban*, 441 U.S. at 392 [*Caban v. Mohammed*, 441
> U.S. 380 (1979)], his interest in personal contact
> with his child acquires a substantial protection under
> the Due Process Clause. At that point it may be
> said that he "act[s] as a father toward his children."
> *Id.* at 389, n.7.

*See also Stanley v. Illinois*, 405 U.S. 645 (1972).

McMahon promptly and persistently attempted to maintain a relationship with Kathy. As we said, in November 2001, before Kathy was born, he initiated a paternity proceeding. It was in that same month that Kristen married Ervin. Kathy was born on January 10, 2002. In June 2003, McMahon was found to be the child's biological father. McMahon was awarded joint legal custody in September 2004 and full custody following a hearing in December 2005. It is hard to see what more he could have done.

But suggesting that McMahon may have protectable rights is not the same as saying that those rights were violated. The law in Wisconsin seems fully in keeping with constitutional requirements. Even though, in Wisconsin, a "man is presumed to be the natural father of a child" if he and the child's mother "are or have been married to each other and the child is conceived or born after marriage . . . .", § 891.41 Wis. Stat., the presumption is rebuttable. An action for a determination of paternity may be brought by a number of people, including a "male alleged or alleging himself to be the father of the child." § 767.80 Wis. Stat. However, the judge may refuse to order genetic testing if he finds that a determination that the man is the father is not in the best interests of the child. § 767.458 Wis. Stat.; *see Randy A.J.*

*v. Norma I.J.*, 270 Wis. 2d 384 (2004). The latter provision has no bearing in the present case because genetic testing was ordered here.

Nevertheless, McMahon says the defendants interfered with his relationship with his daughter and their interference deprived him of procedural due process. What, we wonder, was the custody and paternity proceeding providing, if not due process? At which, we must add, McMahon ultimately prevailed: his paternity was established and he obtained custody of Kathy. "Deprivation" does not seem to be a word that applies here. But McMahon argues that the whole process took too long and he was deprived of some time with Kathy. Unfortunately, court procedures sometimes take long. But in this case, we cannot resist the temptation to speculate that the delay worked in McMahon's favor. The longer the proceedings lasted, the more outlandish Judith DeBruyne's behavior became. For instance, as we noted, the judge determined that the repeated examinations of Kathy for signs of sexual abuse, which found nothing, were detrimental to the child. In addition, by the time of the hearing Kristen DeBruyne had stated that McMahon did not rape her. There is simply no due process violation.

Accordingly, the judgment of the district court is AFFIRMED.

A true Copy:

      Teste:

                       _____
                       *Clerk of the United States Court of*
                       *Appeals for the Seventh Circuit*