In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-3678

BRYN MAWR CARE, INC.,

*Plaintiff-Appellant*,

*v.*

KATHLEEN SEBELIUS, in her official
capacity as Secretary of Health and
Human Services, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11-CV-00734 — **Harry D. Leinenweber**, *Judge.*

ARGUED NOVEMBER 7, 2013 — DECIDED APRIL 8, 2014

Before BAUER, MANION, and SYKES, *Circuit Judges.*

MANION, *Circuit Judge*. Bryn Mawr Care, Inc., is a nursing
home company that maintains a facility in Chicago, Illinois,
occupied exclusively by patients on Medicaid. Without a
hearing, state Medicaid regulators noted three deficiencies at
Bryn Mawr's facility. Federal regulators publicized the
deficiencies, which negatively impacted the facility's reputa-

tion. The regulators also maintained the deficiencies on their internal records, which exposes Bryn Mawr to a risk of harsher penalties and less desirable procedural routes should the facility be found deficient in the future. Bryn Mawr contends that it was entitled to a hearing to challenge the deficiencies under state and federal Medicaid regulations, or alternatively, under the Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution. The district court disagreed and granted summary judgment to the defendants. We affirm.

## I. Factual Background

Bryn Mawr is a Medicaid provider, but not a Medicare provider. The Department of Health and Human Services ("HHS" or "the Secretary") has delegated administration of the Medicare and Medicaid programs to the Centers for Medicare and Medicaid Services ("CMS" or, for convenience, also "the Secretary"). CMS, in turn, has contracted with the Illinois Department of Public Health ("IDPH") to inspect Medicaid providers in Illinois.

On February 11, 2010, IDPH surveyed (inspected) Bryn Mawr's facility in response to allegations that a resident had been sexually assaulted. Bryn Mawr was not cited with any deficiencies immediately following that survey, but IDPH surveyed the facility again on March 23, 2010, and that time cited the facility for three deficiencies related to the care and supervision of residents and staff (which IDPH believed to be the cause of the sexual abuse). A deficiency is a "failure to meet a participation requirement specified in the [Social Security] Act or" regulations. 42 C.F.R. § 488.301. Deficiencies are

categorized alphabetically from "A" to "L" (minor to major) by scope (isolated, pattern, or widespread) and severity. Severity is broken up into four different categories based on whether there has been any actual harm, whether there is any potential for minimal or more than minimal harm, and whether there is "immediate jeopardy." Immediate jeopardy is a situation where a deficiency "has caused, or is likely to cause, *serious* injury, harm, impairment, or death to a resident." 42 C.F.R. § 488.301 (emphasis added). This chart summarizes the deficiency categorization system:

| | | Scope of Deficiency | | |
|---|---|---|---|---|
| | | Isolated | Pattern | Wide-spread |
| Severity of Deficiency | Immediate jeopardy to health and safety | J | K | L |
| | Actual harm that is not immediate jeopardy | G | H | I |
| | No actual harm with potential for more than minimal harm that is not immediate jeopardy | D | E | F |
| | No actual harm with potential for minimal harm | A | B | C |

*See* Center for Medicare and Medicaid Services, *State Operations Manual*, 7400.5.1 (Rev. 63 2010) (hereinafter, "State Operations

Manual").[1] The regulations provide for required and optional remedies that are more drastic the further right or up a deficiency is on the chart (with termination from the Medicaid program reserved for the top tier, J–L). *See* 42 C.F.R. §§ 488.406 (listing remedies); 488.408 (categorizing remedies). Bryn Mawr was cited with two "G" deficiencies ("isolated" incident of "actual harm that is not immediate jeopardy" based on violations of the resident's rights to freedom from sexual abuse and to adequate supervision) and one "E" deficiency (a "pattern" of "no actual harm with potential for more than minimal harm that is not immediate jeopardy" based on failure to sufficiently monitor the resident upon her admission to the facility).[2] This deficiency determination meant that the facility was out of compliance with Medicaid program requirements, so IDPH notified Bryn Mawr of the proposed remedies—in-service training and a $200 a day fine—and its opportunities to challenge the deficiency findings through

---

[1] Available at http://www.cms.gov/Regulations-and-Guidance/Guidance /Manuals/Downloads/som107c07.pdf on page 93 (this link is to the current Manual, but there are no relevant differences between the Manual in effect at the time and the current Manual).

The dark gray deficiencies (F, H, I, J, K, or L) apply when a facility is providing substandard quality of care and is out of compliance; the light gray deficiencies (G, D, or E) apply when a facility is out of compliance but not providing substandard quality of care; and the white deficiencies (A, B, or C) apply when the facility is still in substantial compliance with Medicaid requirements. *See* 42 C.F.R. § 488.301 (definitions for "substandard quality of care" and "substantial compliance").

[2] The deficiencies were violations of 42 C.F.R. §§ 483.13(b), 483.25(h), and 483.75.

Informal Dispute Resolution or submit a plan of correction to avoid the remedies (or both). Bryn Mawr chose both.

Bryn Mawr thought that the deficiency findings were erroneous, so it challenged them via Informal Dispute Resolution (the "informal process"). *See* 42 C.F.R. § 488.331 (requiring state agencies to offer an informal process to challenge deficiency findings). The informal process was just an exchange of written information between Bryn Mawr and IDPH before an outside party, the Michigan Peer Review Organization ("MPRO"). No live hearing was held and therefore no cross-examination or other credibility determinations were conducted regarding the allegations of sexual assault of a resident. IDPH simultaneously conducted an internal review and, on May 6, 2010, found that two of the deficiencies based on the allegations of sexual abuse were not sufficiently supported by credible evidence as required by *Illinois* regulations. However, the MPRO upheld the deficiency findings. Faced with an internal review holding the findings unsupported under Illinois regulations and an outside review upholding the findings, IDPH decided to maintain the deficiency findings under *federal* regulations.[3] Had the process stopped here, Bryn Mawr would have been entitled to a hearing because the proposed remedies were still on the table. *See* 42 C.F.R. § 431.151 (requiring a hearing when a state imposes "a civil money penalty"). But the process did not stop here.

---

[3] Bryn Mawr emphasizes this apparent inconsistency, but does not tell us why this should affect the legal analysis of whether due process was required.

Bryn Mawr also took advantage of the parallel process to "correct" the "deficiencies" and submitted a "plan of correction." At the follow-up inspection, IDPH determined that the deficiencies had been corrected, so it notified Bryn Mawr that it was no longer out of compliance and the proposed remedies would not be imposed. But although they had been "corrected," the fact that there had been deficiency findings remained in the record. Bryn Mawr could have opted not to submit a plan of correction and force a hearing to challenge the deficiencies, but that would have been an unnecessary risk . 42 C.F.R. § 488.408 provides that "each facility that has a deficiency … must submit a plan of correction." If a facility does not think it has a deficiency, it may take the risk of not submitting a plan. Then the regulators would proceed to impose the remedies, which would entitle the facility to a hearing. *See* 42 C.F.R. § 431.151. At that hearing, the facility would have the opportunity to persuade an Administrative Law Judge ("ALJ") that it was not deficient and thereby escape the deficiency findings (and therefore the need to submit a plan of correction) as well as any related remedies. Had all of this occurred, Bryn Mawr might have persuaded an ALJ that the deficiencies were unfounded and emerged a total victor. But had it failed, the proposed remedies would have been imposed with no opportunity to correct the deficiencies. Further, this protracted approach could exacerbate the problem because § 488.456 provides that "CMS and the State may terminate a facility's provider agreement if a facility … [f]ails to submit an acceptable plan of correction within the timeframe specified by CMS or the State." 42 C.F.R. § 488.456(b)(1), (b)(1)(ii). Faced with this dilemma, Bryn Mawr chose to forego the risk of losing the "no

deficiency" argument and submitted the plan of correction. IDPH re-surveyed the facility after Bryn Mawr submitted the plan of correction and found that the facility had returned to substantial compliance, but IDPH still kept a record of the deficiencies.

Thereafter, IDPH passed the deficiency findings on to CMS, which made them available on its website and factored them into the CMS 5-Star Rating System (the "Rating System"). The Rating System is a feature on the medicare.gov website that contains assembled data about nursing facilities' administrative information, compliance history, and anything else that would be of interest to a prospective resident. In addition to making the details available, the website summarizes the data by rating facilities from one to five stars (and just like the dining and hotel industries, a rating with more stars is better). The system also allows prospective residents to compare facilities. However, when IDPH's deficiency findings were factored into the Rating System, they were initially factored in incorrectly. Bryn Mawr's rating was supposed to fall from five to four stars because of the deficiencies, but CMS mistakenly reduced it to two stars. But that error was later corrected when discovered during this litigation. *See Nursing Home Compare,* Medicare.gov, http://www.medicare.gov/nursinghomecompare/profile.html#profTab=0&ID=14E148 (last visited Mar. 6, 2014) (profile of Bryn Mawr Care). Regardless of the tardy partial correction, Bryn Mawr was displeased that its star rating had fallen even one star (from five to four) based on deficiency findings that it had not had the opportunity to challenge at a hearing. So Bryn Mawr sought hearings before both a state and a federal ALJ, but both requests were denied.

The federal hearing request was denied because there is only a limited right for a Medicaid (as opposed to a Medicare) provider to obtain a federal hearing, and Bryn Mawr didn't qualify. The state hearing request was dismissed because the ALJ believed that no remedies had been imposed against Bryn Mawr. Accordingly, on February 1, 2011, Bryn Mawr filed suit in the district court against the Secretary of HHS and the Director of IDPH seeking to compel a hearing. Bryn Mawr's theory was that the regulations entitled it to a hearing and that, even if the regulations did not, the Due Process Clauses of the Fifth and Fourteenth Amendments did. The district court granted summary judgment to defendants on September 26, 2012, ruling that Bryn Mawr was not entitled to a hearing before either a federal or state ALJ under the regulations or the Constitution. Bryn Mawr appeals.

## II. Discussion

On appeal, Bryn Mawr argues that it should have been afforded a hearing to challenge the deficiency findings made by IDPH either because of Medicaid regulations or the constitutional guarantee of due process. We review *de novo* the district court's grant of summary judgment and examine the evidence in the light most favorable to Bryn Mawr to determine whether there is any "genuine dispute as to any material fact." Fed. R. Civ. P. 56(c); *Lees v. Carthage Coll.*, 714 F.3d 516, 520 (7th Cir. 2013). We begin with Bryn Mawr's regulatory argument.

### A. Regulatory Right to a Hearing

On appeal, Byrn Mawr has abandoned the argument that the regulations entitle it to a hearing before a *federal* ALJ, and

instead focuses on its argument that it is entitled to a hearing before a *state* ALJ. The applicable regulations provide, in pertinent part, that:

> [If] a nursing facility … is dissatisfied with a State's finding of noncompliance [deficiency] that has resulted in one of the following adverse actions: (i) Denial or termination of its provider agreement[; or] (ii) Imposition of a civil money penalty or other alternative remedy. … the State must give the facility a full evidentiary hearing … .

42 C.F.R. §§ 431.151; 431.153. Bryn Mawr latches onto the phrase "other alternative remedy" and argues that the plain meaning of those words includes the recording of the deficiencies in its compliance history and the public shaming of Bryn Mawr by the publication of the deficiencies on the CMS website and the Rating System. Bryn Mawr insists that public shaming is a kind of "remedy" that would be "other" and "alternative." *See, e.g.*, Dan M. Kahan & Eric A. Posner, *Shaming White-Collar Criminals: A Proposal for Reform of the Federal Sentencing Guidelines*, 42 J.L. & Econ. 365, 366–67 (1999).

However, because this particular hearing requirement comes from the "Secretary's own regulations, [her] interpretation of it is, under our jurisprudence, controlling unless plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (quotations omitted). The Secretary explains that the term "other alternative remedy" carries special meaning from the context of the regulatory regime. Specifically, the Secretary interprets that term to mean the remedies listed in, or made possible by, 42 C.F.R. § 488.406.

That section lists multiple remedies which may be used. *Id.* at § 488.406(a). As part of the state enforcement plan, state regulators are required to establish protocols at least for the subsection (a) remedies of "(1) Temporary management[;] (2) Denial of payment for new admissions[;] (3) Civil money penalties[;] (4) Transfer of residents[;] (5) Closure of the facility and transfer of residents[; and] (6) State monitoring." *Id.* at § 488.406(b). States may also establish any of the other remedies from subsection (a) or "alternative or additional State remedies *approved by CMS*." *Id.* at § 488.406(a)(9) (emphasis added). But to create its own alternatives, the state has to "[s]pecify those remedies in the State plan; and … [d]emonstrate to CMS's satisfaction that those remedies are as effective as the remedies listed in paragraph (a) of this section, for deterring noncompliance and correcting deficiencies." *Id.* at § 488.406(c)(1)–(2).

Accordingly, the Secretary asserts that, because maintaining a compliance history and publishing deficiencies through the Rating System are not part of the remedial framework of § 488.406, those actions are not "other alternative remedies." While the regulation could have explicitly cross-referenced § 488.406 (as its Medicare cousin does, *see* 42 C.F.R. § 498.3(b)(13)), we do not think the Secretary's interpretation is plainly erroneous or inconsistent with the regulation. Thus, as none of the remedies listed in, or made possible by, § 488.406 has been imposed on Bryn Mawr, it is not entitled to a state hearing under § 431.151.

*B. Constitutional Right to a Hearing*

Alternatively, Bryn Mawr argues on appeal that it is entitled to challenge the deficiency findings in a hearing before a federal or state ALJ—regardless of any regulatory failure to provide such an opportunity—because of the Due Process Clauses of the Fifth and Fourteenth Amendments, respectively. U.S. Const. amend. V ("No person shall … be deprived of life, liberty, or property, without due process of law … ."); amend. XIV, § 1 ("No state shall … deprive any person of life, liberty, or property, without due process of law … ."). Bryn Mawr's claim that it is entitled to a hearing is a *procedural* due process claim—an unfortunate but necessary redundancy. *See Gosnell v. City of Troy, Ill.*, 59 F.3d 654, 657 (7th Cir. 1995). A procedural due process claim requires a two-fold analysis. "First, we must determine whether [Bryn Mawr] was deprived of a protected interest [and, if so]; second, we must determine what process is due." *Pugel v. Bd. of Trs. of Univ. of Ill.*, 378 F.3d 659, 662 (7th Cir. 2004). The district court ruled that Bryn Mawr failed to establish a protected interest, and that has been the parties' focus on appeal.

> [T]he range of interests protected by procedural due process is not infinite … and … with respect to property interests they are, of course, … not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Paul v. Davis*, 424 U.S. 693, 709 (1976) (citing *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 570, 577 (1972)). But "defamatory publications," like the publishing of deficiencies, "however seriously they may … harm[] [Bryn Mawr's] reputation, d[o] not deprive [it] of any 'liberty' or 'property' interests protected by the Due Process Clause." *Id.* at 712. Stigma is not enough. *Id*. at 709. Rather, "[t]o avoid constitutionalizing state defamation law, defamation by a government actor does not implicate the Due Process Clause unless 'a right or status previously recognized by state law was distinctly altered or extinguished' as a result." *Abcarian v. McDonald*, 617 F.3d 931, 941 (7th Cir. 2010) (citing *Paul v. Davis*, 424 U.S. at 711). Accordingly, we apply a "stigma plus" analysis where "an injury to reputation *along with* a change in legal status constitutes the deprivation of a property right." *Somerset House, Inc. v. Turnock*, 900 F.2d 1012, 1015 (7th Cir. 1990).[4]

Bryn Mawr acknowledges this standard and asserts that—in addition to the stigmatization of the deficiency findings—its rights were altered in three distinct ways: (1) it is now exposed to the potential of enhanced penalties based on

---

[4] We do not decide whether defamation "in a manner that makes it virtually impossible for [Bryn Mawr] to" operate "in [its] chosen field" is sufficient to amount to a deprivation of a constitutionally protected right because Bryn Mawr has neither argued nor alleged that the deficiency publication had that effect. *Abcarian v. McDonald*, 617 F.3d 931, 941 (7th Cir. 2010) ("To plead a constitutionally relevant tangible loss of his employment opportunities, Abcarian must allege that his 'good name, reputation, honor or integrity [was] called into question in a manner that makes it virtually impossible for [him] to find new employment in his chosen field.'" (citations omitted)).

past noncompliance; (2) it no longer has the opportunity to correct "actual harm" deficiencies before remedies are imposed; and (3) that "past non-compliance" will be factored into the Rating System by "points associated with a 'G' level deficiency" if Bryn Mawr is found deficient again.

Bryn Mawr's third contention is quickly dispatched. Bryn Mawr cites CMS's *Design for Nursing Home Compare Five-Star Quality Raing System: Technical Users' Guide* (July 2012) ("Technical User's Guide")[5] for the fact that past non-compliance is factored into its rating with the addition of points associated with a "G" level deficiency *if* the past non-compliance is followed by a "J," "K," or "L" deficiency. *See* Technical User's Guide at 4 (describing how facts of compliance history are assigned point values to factor them into the Rating System). But this guide has nothing to do with determining deficiencies or penalties, it merely explains how deficiencies are factored into the Rating System. *See* Technical User's Guide at 2 ("This document provides a comprehensive description of the design for the *Nursing Home Compare* Five-Star Rating System."). Even if there could be a similar future defamation that is more defamatory because of this prior defamation, that is only a risk of greater stigma. That is not enough. The prior defamation does not amount to a "stigma plus" unless it causes a change in legal status. Therefore, this effect of Bryn Mawr's having a deficiency on its record is not enough to trigger a right to due process. The remaining two contentions require more consideration.

---

[5] Available at http://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/CertificationandComplianc/Downloads/usersguide.pdf.

### 1. Loss of the Opportunity to Correct

When Bryn Mawr was cited with the deficiencies at issue in this case, it was given the opportunity to correct them before any remedies were imposed. The regulations gave IDPH the discretion to afford Bryn Mawr this opportunity. *See* State Operations Manual § 7304.1 (Rev. 63 2010). However, after Bryn Mawr was cited with deficiencies involving actual harm ("G" level deficiencies"), had it been found deficient on the next survey, there would have been no opportunity to correct the deficiencies before remedies were imposed (though it would be afforded a hearing).[6] *See* State Operations Manual § 7304.2.1 (Rev. 63 2010) (mandating that facilities with "G" deficiencies on the last survey not being given a pre-remedy opportunity to correct); *see also* 42 C.F.R. §§ 431.151; 431.153 (providing a hearing when remedies are imposed). Bryn Mawr

---

[6] The follow-up survey where Bryn Mawr was found in compliance did not alleviate this risk because regulators look to the "previous *standard* survey." State Operations Manual § 7304.2.1 (Rev. 63 2010). Now, while this case has been pending, Bryn Mawr has performed well on subsequent standard surveys, so it is no longer at risk of this predicament. Regardless, we must decide whether this risk was a change in legal status that required a hearing because a finding of a "G" level deficiency could occur again, but the one-year reset after standard surveys could result in the issue always evading review. *See, e.g.*, *United States v. Peters*, 754 F.2d 753, 757–58 (7th Cir. 1985) ("A case is not moot, however, where even though the factual controversy is over, the case involves an order 'capable of repetition, yet evading review.' Two conditions must be met to avoid mootness: 'the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and there was a reasonable expectation that the same complaining party would be subjected to the same action again.'" (citations omitted)).

contends that this was an alteration of its right. But what *right* was altered? Bryn Mawr never had a right to an opportunity to correct; such an opportunity was always a matter of IDPH's discretion. "A property interest of constitutional magnitude exists only when the state's discretion is 'clearly limited' such that the plaintiff cannot be denied the interest 'unless specific conditions are met.'" *Brown v. City of Mich. City, Ind.*, 462 F.3d 720, 729 (7th Cir. 2006) (citing *Colburn v. Trs. of Ind. Univ.*, 973 F.2d 581, 589 (7th Cir. 1992)). IDPH's discretion was subject to no such limitations. *See* State Operations Manual § 7304.1 (Rev. 63 2010). Bryn Mawr "cannot point to a state law, or another independent source, that *guarantees* [it]" an opportunity to correct. *Brown*, 462 F.3d at 729. So, "[b]ecause the right to" an opportunity to correct deficiencies "is not 'securely' [Bryn Mawr's], it cannot be claimed as a valid property interest." *Id*. If Bryn Mawr had held a secure right to an opportunity to correct that was lost—or even altered, *e.g.*, narrowed in scope—that might have been enough. *See Somerset House, Inc. v. Turnock*, 900 F.2d 1012, 1015 (7th Cir. 1990) ("[T]he combination of the Conditional License with the loss of eligibility for QUIP funding was sufficient because the *loss of eligibility for funding was a change in legal status*." (emphasis added)); *Cameo Convalescent Ctr., Inc. v. Senn*, 738 F.2d 836, 843 (7th Cir. 1984) ("Cameo's placement upon the SOR list, like the individual placed on the list of known drunks in *Davis*, deprived Cameo of a right under state law: the *right to receive referrals from state social service departments and agencies*." (emphasis added)). But because the opportunity to correct is not a right that is securely Bryn Mawr's, deprivation or alteration of the opportunity does not give rise to a right to due process.

2. Exposure to Enhanced Penalties

When IDPH finds deficiencies at a nursing facility and sets about selecting which remedy (or remedies) to impose, it is required to look at a number of factors to determine the seriousness of the deficiency (the "initial assessment"). The mandatory factors pertain to the scope and severity of the particular deficiency found—those factors are summarized in the table *infra* at 3. However, IDPH and CMS are not limited to considering the mandatory factors.

> Following the initial assessment, CMS and the State may consider other factors, which may include, but are not limited to the following: (1) The relationship of the one deficiency to other deficiencies resulting in noncompliance[ and] (2) The facility's prior history of noncompliance in general and specifically with reference to the cited deficiencies.

42 C.F.R. § 488.404(c). Bryn Mawr argues that, the moment it had the deficiencies at issue in this case on its record, its legal status was altered because there was the potential that future deficiencies would be punished with a harsher remedy based on the past deficiencies. The Secretary responds that Bryn Mawr's argument is too contingent and too speculative to amount to an alteration of a right—*if* Bryn Mawr is found deficient in the future IDPH *may* select a harsher remedy based on past deficiencies. In return, Bryn Mawr points to *Humphries v. Cnty. of L.A.*, 554 F.3d 1170, 1187–88 (9th Cir. 2009) *rev'd and remanded on other grounds sub nom. L.A. Cnty., Cal. v. Humphries*, 131 S. Ct. 447 (2010).

In *Humphries*, the Ninth Circuit held that parents had been deprived of a liberty interest by being erroneously listed on a child abuse registry, when California "law effectively require[d] agencies to check [that] stigmatizing list and investigate any adverse information prior to conferring a legal right or benefit" (such as licensure, child custody, or employ-ment).[7] *Id.* at 1188. The Ninth Circuit reasoned that being on the list was "an added burden on entities wishing to confer legal rights or benefits, mak[ing] the chances of receiving a benefit conferred under California law less likely, and practi-cally guarantee[ing] that conferral of that benefit will be delayed." *Id.* at 1192. Therefore, the legally imposed burden on those entities was a "tangible burden" on the parents' ability to obtain any of the rights meted out by those entities which was tantamount to an alteration of the parents' rights. *Id.* at 1191–92.[8]

---

[7] The Ninth Circuit used the phrase "*effectively* required" because only some agencies were actually required to check the list, but the court reasoned that the fact an entity "may" check the list "in conjunction with a rule or custom of 'must' can equally deprive a citizen of a liberty interest giving rise to a procedural due process claim." *Id.* at 1191 (emphasis added).

[8] The Second Circuit has reached a similar result where the legal impedi-ment was even more onerous. *See Valmonte v. Bane*, 18 F.3d 992, 1001 (2d Cir. 1994) ("Valmonte has alleged that because of her inclusion on the Central Register, and because all child care providers must consult that list, she will not be able to get a job in the child-care field. In other words, by operation of law, her potential employers will be informed specifically about her inclusion on the Central Register and will therefore choose not to hire her. Moreover, *if they do wish to hire her*, those employers are *required by law to explain the reasons why in writing*." (Emphasis added)). *But see Smith v.*

(continued…)

IDPH and CMS are required to look at Bryn Mawr's compliance history in the event of future noncompliance to see whether the agency may allow Bryn Mawr an opportunity to correct. *See, e.g.*, State Operations Manual § 7304.2.1 (Rev. 63 2010) (necessitating a check of compliance history). But that check does not alter Bryn Mawr's rights, *see infra* 12–13, nor does it burden IDPH or CMS's determinations of whether to confer (or rather maintain) Bryn Mawr's "rights or benefits" (participation in the Medicaid program without any remedies). IDPH or CMS will impose a remedy if there is a new deficiency and *may* look to Bryn Mawr's compliance history as a factor in selecting a remedy. But the lack of a requirement that IDPH consider the prior deficiencies in selecting a remedy is only one thing that distinguishes this case from *Humphries*. The agencies that found Bryn Mawr deficient are the same agencies that would later determine whether to consider those deficiencies in crafting a remedial plan. And if they decide to base the remedial plan on that past deficiency as well, Bryn Mawr is entitled to challenge the past deficiency at the same hearing that it challenges the new deficiency. *See* 42 C.F.R. § 488.408(g)(1); *Fort Tyron Nursing Home v. HCFA*, DAB CR425 (H.H.S. 1996).[9] Accordingly, any burden the deficiency finding has on Bryn Mawr's rights is entirely speculative up until the

---

(...continued)
*Siegelman*, 322 F.3d 1290, 1297 (11th Cir. 2003) (rejecting the claim that being placed on a child abuse index was a deprivation of a liberty interest when the system contained no similar legal strictures).

[9] Available at http://www.hhs.gov/dab/decisions/civildecisions/1996/cr425.pdf.

time that Bryn Mawr would be entitled to a hearing to challenge it. This is a far cry from the state law in *Humphries* that required potential employers, licensing agencies, and family courts to look at a list and investigate the accusations of child abuse before bestowing any number of rights. The parents were constantly at risk of being denied rights because of the burden the law put on the agencies. And, after each denial, they are left at risk of rejection as they proceed, with the stigma still attached, to the next agency that must follow the law. The legal burdens on these agencies was a tangible burden on the parents. Bryn Mawr is in no such dilemma. Should its speculative harm of enhanced penalties manifest itself, it would immediately be afforded the opportunity to clear its name—once and for all.

The Ninth Circuit concluded that legally burdening numerous agencies and entities by "effectively" requiring them to check a defamatory list is a tangible burden on an individual's obtaining rights that is tantamount to altering that individual's rights. We need not decide whether we agree with the Ninth Circuit. Bryn Mawr lost an opportunity to correct, and that is not a right. What is a right is Bryn Mawr's ability to continue operating as a Medicaid facility without remedies imposed. That right is not burdened by the deficiency finding *until* (or *unless*) the finding is used to justify a remedy, at which time a hearing is afforded to challenge the deficiency finding.

One final possibility merits consideration. IDPH and CMS could decide to select a more serious remedy for a new deficiency because of the past deficiencies, *see* 42 C.F.R. § 488.404 (permitting consideration of prior noncompliance in selecting a remedy), but without explicitly stating that the

remedy is being imposed for the past deficiencies. This does not appear to be the practice, but neither CMS nor IDPH have pointed us to a regulation that requires them to cite a past deficiency as a basis for a remedy. If this were to occur, it would be impossible for Bryn Mawr to challenge the past deficiency collaterally. *Compare* 42 C.F.R. § 488.408(g)(1) (permitting an "appeal [of] a certification of noncompliance *leading to* an enforcement remedy") *with id.* at § 488.408(g)(2) (forbidding appeal of the "choice of remedy, including the *factors considered* by CMS or the State in *selecting the remedy*, specified in § 488.404.") (emphasis added); *see also* 42 C.F.R. § 488.404(c)(2) (listing "[t]he facility's prior history of noncompliance in general and specifically with reference to the cited deficiencies" among "*factors* which may be *considered* in *choosing a remedy*") (emphasis added). Accordingly, a remedy could be enhanced because of (but not imposed based on) the past deficiencies and the regulations would quite explicitly forbid challenging that deficiency because it was merely a "factor in selecting the remedy" instead of a "certification of noncompliance leading to an enforcement remedy."[10]

At first glance, this appears problematic. For example, if there had been a subsequent finding of noncompliance, IDPH would have imposed remedies. *See* State Operations Manual § 7304.2.1 (Rev. 63 2010). These remedies could be based on the new deficiency alone. However, instead of a $200 per day civil

---

[10] We cannot be sure the Secretary would interpret her regulations this way, and we do not purport to definitively interpret them here because we have not been called on to interpret them since this situation has not occurred. We are merely weighing a harm that Bryn Mawr speculates could occur.

money penalty, it could have imposed a $300 per day civil money penalty because, in its internal deliberations, it decided to consider Bryn Mawr's "prior history of noncompliance." 42 C.F.R. § 488.404(c)(2). This internal deliberation, and the deficiencies it considered, would be unchallengeable. 42 C.F.R. § 488.408(g)(2).

However, any due process argument based on this fails for the same reason that Bryn Mawr's argument on the loss of the opportunity to correct fails. It always lies within IDPH or CMS's discretion to pick a remedy within a category—that is, it could impose a $300 civil money penalty regardless of whether it considered the prior deficiency. The fact that state and federal regulators may consider a defamatory statement (in fact, their defamatory statement) in the later exercise of their discretion is not an alteration of Bryn Mawr's legal rights. *Brown*, 462 F.3d at 729[11]. If, as a result of the prior defamatory statement, *new* remedies not previously available to IDPH or CMS became available, that might be an alteration of Bryn Mawr's rights, but there is no allegation that such is the case here.

## III. Conclusion

Bryn Mawr has been stigmatized, and as a facility completely filled with Medicaid patients, it is at the mercy of regulators entrusted by statute with enormous discretion.

---

[11] *See also Siegert v. Gilley*, 500 U.S. 226, 234 (1991) ("But so long as such damage flows from injury caused by the defendant to a plaintiff's reputation, it may be recoverable under state tort law but it is not recoverable in a *Bivens* action.") (discussing the holding in *Paul v. Davis*, 424 U.S. at 708–09, that one does not have a liberty interest in his reputation).

However, Bryn Mawr has failed to show that any of its rights have been altered. At worst, regulators may keep a stigmatizing record of noncompliance to guide the exercise of their discretion, but without the alteration or extinguishment of a right, Bryn Mawr has not been deprived of a "life, liberty, or property" right. U.S. Const. amends. V and XIV, § 1. With no deprivation of a protected right, Bryn Mawr was not entitled to an opportunity to challenge the deficiency findings in a hearing. *Id.* For the foregoing reasons, the judgment of the district court is AFFIRMED.