In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-2254

JIMMY HINKLE,

*Plaintiff-Appellant,*

*v.*

RICK WHITE and THOMAS OLIVERIO,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 12-CV-00133 — **Michael J. Reagan**, *Chief Judge.*

ARGUED DECEMBER 11, 2014 — DECIDED JULY 16, 2015

Before WOOD, *Chief Judge*, and FLAUM and MANION, *Circuit Judges.*

MANION, *Circuit Judge.* Jimmy Hinkle sued Rick White, an investigator with the Illinois State Police, and White's supervisor, Thomas Oliverio, alleging that they violated his due process rights by spreading rumors that he was an arsonist and a child molester. The district court concluded that Hinkle had not established a protected liberty interest and granted the defendants summary judgment. We affirm.

**I**.

In August 2010, while Jimmy Hinkle was finishing his elected term as Sheriff of Wayne County, Illinois, his fourteen-year-old step-daughter falsely accused him of sexually abusing her while helping her apply chigger medicine.[1] An officer with the Charleston, Illinois Police Department interviewed the step-daughter and the Illinois Department of Children and Family Services ("DCFS") notified the Illinois State Police that it had received a report that Hinkle had sexually abused his step-daughter.

Rick White, an investigator with the Illinois State Police, began investigating the step-daughter's allegations. White interviewed the step-daughter and she repeated her claim of sexual abuse. However, her sister (another of Hinkle's step-daughters) was also interviewed and she said that Hinkle had also helped her apply chigger medication and that it was non-sexual. She also said she thought her sister was lying because Hinkle and her mom were too strict. White also interviewed Hinkle, who denied the allegation. The step-daughter later recanted her claim of sexual abuse on several occasions and an Illinois prosecutor declined to press charges against Hinkle.

Nonetheless, the accusations became well-known in the community because White talked to a lot of people with whom he had no business sharing details of the investigation. For

---

[1]   Because this case comes to us at the summary judgment stage, we set forth the facts in the light most favorable to the non-moving party, Hinkle. *Little v. Illinois Dept. of Revenue*, 369 F.3d 1007, 1008 (7th Cir. 2004).

example, while at the local Wal-Mart in January 2011, White told Roy Finley, his third cousin and a felon, to listen to the news and that there would be a story about a former Wayne County Sheriff,[2] whom Finley was able to determine was Hinkle from White's comments. White told Finley that there was a "bad charge" and that "the former sheriff would be looking at prison time." White also told Stephanie Luker, a Trooper with the Illinois State Police, that there was a sexual assault case against Sheriff Hinkle. (Luker was in no way involved in the investigation of the matter.) Additionally, White told Jonah Kinsolving, an investigator with the Secretary of State's Office (who also had nothing to do with the investigation) that he (White) was investigating Hinkle for sexually abusing his step-daughter. White told Kinsolving that he (White) was right in believing Hinkle sexually abused his step-daughter. Kinsolving went home and told his wife about it and his wife in turn told her hairdresser.

If telling the local hairdresser wasn't enough to churn the rumor mill, word was also leaked to the local paper, the *Disclosure*, at White's instigation. White directed Greg Hanisch, an inspector for the Southern Illinois Drug Task Force (who worked out of the Illinois State Police station), to tell a local reporter to look into the Kelly Henby and Hinkle matter. Henby was apparently a private investigator who interviewed the step-daughter and to whom she recanted. Hanisch leaked

---

[2]   While Hinkle was still the Sheriff at the time of his step-daughter's false allegations in August 2010, he had lost the February 2010 primary election for Sheriff and was no longer serving as Sheriff at the time of White's conversation with Finley.

to the *Disclosure* that an arrest warrant had been issued for Henby charging him with working as a private investigator without a license. The *Disclosure* also published an article that included details of the step-daughter's initial claim of sexual abuse, although the article, in essence, said the step-daughter was lying and provided an innocent explanation for what really happened, while positing that the information was made public in retaliation for Henby and Hinkle crossing White on other matters. Nonetheless, in the end, the rumor that Hinkle was a child molester permeated the public sphere.

In addition to the rumor that Hinkle had sexually abused his step-daughter, there was talk that Hinkle was also an arsonist. A couple of months before his step-daughter falsely accused him of sexually assaulting her, Hinkle's home was destroyed by a fire. White spoke with the State Fire Marshal concerning the investigation into the cause of the fire and asked a detective with the Wayne County Sheriff's Department whether he "suspected anything" about the fire. Thomas Oliverio, a lieutenant with the Illinois State Police, went one step further, saying to another investigator, "[h]ow much do you want to bet me that [Hinkle's] prize 1950 Chevy was not in the garage when he burnt his house? … I'm telling you, he moved that car from his garage before the fire."

After his step-daughter recanted her accusation of sexual abuse and the prosecutor declined to press charges, Hinkle filed this § 1983 suit against White and Oliverio, alleging the defendants denied him his right to liberty in the occupation of his choice without due process of law. Specifically, Hinkle alleged that the defendants, by spreading the rumors that he was an arsonist and child molester, rendered him unable to

find a job in law enforcement management. The defendants moved for summary judgment. The district court granted the defendants summary judgment, concluding that Hinkle did not establish a protected liberty interest. Hinkle appeals. We review the district court's grant of summary judgment *de novo*. *Simpson v. Beaver Dam Comm. Hosp., Inc.*, 780 F.3d 784, 789 (7th Cir. 2015).

## II.

The Fourteenth Amendment forbids a state from depriving a person of "life, liberty, or property, without due process of law." U.S. Const. Amend. XIV § 1. To prevail on a procedural due process claim, "a plaintiff must establish that a state actor deprived him of a constitutionally protected liberty or property interest without due process of law." *Dupuy v. Samuels*, 397 F.3d 493, 503 (7th Cir. 2005). In evaluating a due process claim, we ask two questions: 1) "whether there exists a liberty or property interest which has been interfered with by the State;" and 2) "whether the procedures attendant upon that deprivation were constitutionally sufficient." *Id.*

Hinkle claims he has a protected liberty interest to pursue the occupation of his choice, namely law enforcement management. "The concept of liberty protected by the due process clause has long included occupational liberty—'the liberty to follow a trade, profession, or other calling.'" *Wroblewski v. City of Washburn*, 965 F.2d 452, 455 (7th Cir. 1992) (quoting *Lawson v. Sheriff of Tippecanoe County*, 725 F.2d 1136, 1138 (7th Cir. 1984)). However, "[i]t is the liberty to pursue a *calling or occupation*, and not the right to a specific job, that is secured by the Fourteenth Amendment." *Id.* (emphasis added). Previ-

ously, "[w]e have declared that being a police officer is an occupation; being a police lieutenant is not." *Wroblewski*, 965 F.2d at 455 (quotation omitted). Thus, while "[t]o be a police-man is to follow a particular calling and to be excluded from that calling is an infringement of liberty of occupation, … a particular rank in the police force is not an occupation … " *Bigby v. City of Chicago*, 766 F.2d 1053, 1057 (7th Cir. 1985). In this case, Hinkle presented evidence that he applied for, and was rejected for, five out-of-state Chief-of-Police jobs. "Chief of Police" and "law enforcement management" equate more closely to holding a particular rank or job in the police force, than to following a particular calling. However, we need not rest on this point. Even if we treat law enforcement manage-ment as an occupation, as discussed below, Hinkle still cannot succeed on his due process claim because he cannot show that this liberty interest was "interfered with by the State."

Hinkle claims the defendants interfered with his liberty interest in his occupation by spreading rumors that he had sexually abused his step-daughter and committed arson. Reading the facts in the light most favorable to Hinkle, White gravely harmed Hinkle's reputation by his unprofessional conduct that resulted in the step-daughter's false claim of sexual abuse becoming well-known in the community. It is less clear whether Oliverio's suggestion that Hinkle committed arson was broadcast more broadly and also harmed his reputation.[3] But even assuming Oliverio likewise harmed

---

[3]   Hinkle also seeks to hold Oliverio responsible for White's defamatory statements because Oliverio supervised White and participated in portions

(continued…)

Hinkle's reputation, "mere defamation by the government does not deprive a person of 'liberty' protected by the Fourteenth Amendment, even when it causes serious impairment of one's future employment." *Hojnacki v. Klein-Acosta*, 285 F.3d 544, 548 (7th Cir. 2002). "Rather, it is only the 'alteration of legal status,' such as government deprivation of a right previously held, 'which, combined with the injury resulting from the defamation, justif[ies] the invocation of procedural safeguards.'" *Mann v. Vogel*, 707 F.3d 872, 878 (7th Cir. 2013) (quoting *Paul v. Davis*, 424 U.S. 693, 708–09 (1976)); *Townsend v. Vallas*, 256 F.3d 661, 669 (7th Cir. 2001). Thus, we conduct a "stigma-plus" analysis to determine whether there was "an injury to reputation *along* with a change in legal status …" *Somerset House, Inc. v. Turnock*, 900 F.2d 1012, 1015 (7th Cir. 1990) (emphasis added).

In this case, the defendants did nothing to alter Hinkle's legal status. Rather, reading the facts in the light most favorable to Hinkle, the defendants defamed him. Even if that defamation seriously impaired his future employment prospects, the state did not alter his legal status. Thus, while Hinkle

---

[3] (...continued)

of the investigation, such as the interviews of Hinkle. While Oliverio participated in portions of the investigation, Hinkle did not present any evidence that Oliverio facilitated, approved of, or condoned White's defamation. Thus, there is no supervisory liability for Oliverio based on White's defamatory statements. *See Chavez v. Illinois State* Police, 251 F.3d 612, 651 (7th Cir. 2001) (explaining that a supervisor is not liable for the constitutional violations of a subordinate absent the supervisor's personal involvement in the unconstitutional conduct).

showed a serious stigma, without the "plus," he cannot maintain a due process claim for the denial of a liberty interest.

In response, Hinkle seemingly argues that he need not show that the state altered his legal status because the defendants' defamation made it "virtually impossible" for him to find new employment in upper-level management of police work. In support of his position, Hinkle quotes our decisions in *Doyle v Camelot Care Ctrs., Inc.*, 305 F.3d 603, 617 (7th Cir. 2002), and *Townsend*, 256 F.3d at 670, wherein we said: "[W]hen a state actor casts doubt on an individual's 'good name, reputation, honor or integrity' in such a manner that it becomes 'virtually impossible for the [individual] to find new employment in his chosen field,' the government has infringed upon that individual's 'liberty interest to pursue the occupation of his choice.'" *Doyle*, 305 F.3d at 617 (quoting *Townsend*, 256 F.3d at 670).

Hinkle, however, reads this language completely out of context. In *Doyle*, two child-care workers sued various state actors after they were "indicated" for child abuse or neglect, their names were placed on a central registry, they were fired from their jobs, and were in essence blacklisted from child-care employment. As a result of their "indicated" status, the plaintiffs were fired. It was in this context that *Doyle*, quoting *Townsend*, spoke of it becoming "virtually impossible for the [individual] to find new employment in his chosen field." *Doyle*, 305 F.3d at 617. But the state in *Doyle* had also altered the plaintiffs' legal status by indicating them for child abuse and child neglect on its central registry. Thus, *Doyle* does not stand for the broader proposition that defamation by state actors

which forecloses employment in their field of choice constitutes the denial of a liberty interest.

*Townsend*, which *Doyle* quoted (and on which Hinkle also relies), more clearly demonstrates that defamation, even if it forecloses employment in a field or profession, is not actionable as a Due Process claim. In *Townsend*, Alex Riley, a part-time lifeguard and high school swimming coach, sued the school's Board of Trustees and two individual administrators, claiming:

> the defendants deprived him of a liberty interest in his occupation when they dismissed him from his position … and then made statements to the *Chicago Sun-Times*, … to the effect that Mr. Riley should not be rehired by the Board due to his "failure to perform duties" in the events surrounding [a student's] death.

*Townsend*, 256 F.3d at 669.

In discussing Riley's liberty interest claim, this court explained that the Supreme Court has "held that the state may infringe a plaintiff's liberty interest when, *in declining to rehire an employee*, it makes a 'charge against him that might seriously damage his standing and associations in his community' that places his 'good name, reputation, honor, or integrity … at stake' or when, in failing to rehire, it imposes on the plaintiff 'a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities.'" *Townsend*, 256 F.3d at 669 (quoting *Board of Regents v. Roth*, 408 U.S. 564, 573 (1972)) (emphasis added). This court continued:

at the heart of every claim that an employer has infringed an employee's liberty of occupation, is a charge that the "circumstances of that discharge, at least if they were publically stated, had the effect of blacklisting the employee from employment in comparable jobs*." In such cases*, the employee's good name, reputation, honor or integrity must be called into question in a manner that makes it virtually impossible for the employee to find new employment in his chosen field.

*Townsend*, 256 F.3d at 670 (quoting *Colaizzi v. Walker*, 812 F.2d 304, 307 (7th Cir. 1987)) (emphasis added).

The "virtually impossible for the employee to find new employment" language from *Townsend*, quoted by *Doyle* and relied upon by Hinkle, was used in the context of "such cases" where the state declined to rehire the individual or discharged the individual. *See also Lashbrook v. Oerkfitz*, 65 F.3d 1339, 1348–49 (7th Cir. 1995) ("However, to infringe an employee's liberty interests, the *circumstances of the termination* must make it virtually impossible for the employee to find new employment in that field."). On several occasions since then, in discussing a liberty interest in an occupation, this court has quoted the boilerplate "virtually impossible for the [individual] to find new employment in his chosen field" language of *Townsend. See, e.g., Khan v. Bland*, 630 F.3d 519, 535 (7th Cir. 2010); *McMahon v. Kindlarski*, 512 F.3d 983, 988 (7th Cir. 2008); *RJB Properties, Inc. v. Board of Educ. of City of Chicago*, 468 F.3d 1005, 1011 (7th Cir. 2006); *Brown v. City of Michigan City, Indiana*, 462 F.3d 720, 730 (7th Cir. 2006). But this court has *never* held that the State infringes on a plaintiff's liberty interest

when the defamation *alone* renders it "virtually impossible for the [individual] to find new employment in his chosen field." *Townsend*, 256 F.3d at 670; *see Bryn Mawr Care, Inc. v. Sebelius*, 749 F.3d 592, 598 n.4 (7th Cir. 2014) ("We do not decide whether defamation 'in a manner that makes it virtually impossible for [plaintiff] to' operate 'in [its] chosen field' is sufficient to amount to a deprivation of a constitutionally protected right …").

Nor could such a holding be reconciled with the Supreme Court's decision in *Paul v. Davis*, 424 U.S. 693 (1976), from which our stigma-plus line of cases descends. *See Colaizzi*, 542 F.2d at 973 (stating "[a]s we read *Paul v. Davis*, stigma to one's reputation, inflicted by the state, is not of itself a deprivation of liberty within the meaning of the Fourteenth Amendment," and coining "stigma-plus" as shorthand for the standard of *Paul*). In *Paul*, Edward Davis sued the Chiefs of Police of Louisville and Jefferson County, Kentucky after they circulated a "flyer" to nearly 800 merchants which included his name and photograph under the moniker "Active Shoplifters." At the time the flyer had been distributed, the charges were merely pending—Davis had not been convicted of shoplifting. The charges were eventually dismissed, but not before Davis's supervisor had seen the flyer and, while not firing him, warned him "he had best not find himself in a similar situation" in the future." *Id.* at 696. Davis sued the police chiefs, alleging among other things that the flyer deprived him of liberty within the meaning of the Fourteenth Amendment.

In considering Davis's argument, the Supreme Court in *Paul* analyzed a number of its prior cases which looked at defamation by the government in a variety of contexts. After

summarizing the relevant precedent, the Supreme Court stressed "[i]n each of these cases, as a result of the state action complained of, a right or status previously recognized by state law was distinctly altered or extinguished." *Id.* at 711. The Court continued: "It was this alteration, officially removing the interest from the recognition and protection previously afford by the State, which we found sufficient to invoke the procedural guarantees contained in the Due Process Clause of the Fourteenth Amendment." *Id.* The Court then concluded that because Paul did not "assert denial of any right vouchsafed to him by the State, … [the defendant's] defamatory publications, however seriously they may have harmed [Paul's] reputation, did not deprive him of any 'liberty' or 'property' interests protected by the Due Process Clause." *Id.* at 712.

This analysis makes clear that to claim a deprivation of liberty, the state must "distinctly alter" or "extinguish" a right or status previously recognized by state law. Defamation alone, even if it renders it "virtually impossible for the [individual] to find new employment in his chosen field," *Townsend*, 256 F.3d at 670, thus is not enough to invoke the procedural safeguards of the Fourteenth Amendment. "Rather [a plaintiff's] interest in reputation is simply one of a number which the State may protect against injury by virtue of its tort law, providing a forum for vindication of those interests by means of damages actions." *Paul*, 424 U.S. at 712.

Alternatively, Hinkle attempts to fit his case within this Supreme Court precedent by arguing that the defendants' defamatory statements altered his "legal status" by rendering him unqualified to serve in law enforcement management. In support of this argument, Hinkle cites 65 ILCS 5/10-2.16(j),

which provides: "No person shall be appointed to the police or fire department unless he or she is a person of good character and not an habitual drunkard, gambler, or a person convicted of a felony or crime involving moral turpitude." Hinkle argues that the defendants' defamation branded him a person not of good character and thereby barred him from employment in his chosen profession.

Hinkle's argument is misplaced. The defendants did not "distinctly alter" or "extinguish" Hinkle's "legal status." They defamed him. They did not place Hinkle's name on a list which by statute removed a previously held right to serve in law enforcement management. This situation thus contrasts sharply with the cases involving an alteration in legal status. For instance, in *Wisconsin v. Constantineau*, 400 U.S. 433 (1971), on which Hinkle also relies, the defendants "posted" the plaintiff's name to a list which, by statute, removed his right to purchase alcoholic beverages. *Id.* at 435. As the Supreme Court explained, "it was that alteration of legal status, which, *combined with* the injury resulting from the defamation, justified the invocation of procedural safeguards." *Paul*, 424 U.S. at 708–09 (emphasis added) (citing *Constantineau*, 400 U.S. 433).

Moreover, Hinkle received a license in Illinois to work as a private investigator, and by statute he was required to be "of good moral character" to qualify for such a license. 225 ILCS 447/15-10(a)(3). This fact further negates Hinkle's claim that the defendants' defamation rendered him unqualified under Illinois law to serve in law enforcement. For all of these reasons, the defendants did not "distinctly alter" or "extinguish" Hinkle's legal status and thus he has no liberty interest

for purposes of the Due Process Clause of the Constitution.[4] Accordingly, the district court properly granted the defendants summary judgment on Hinkle's due process claim.

**III**.

Reading the facts in the light most favorable to Hinkle, the defendants defamed him—horribly so. But the Due Process Clause of the Constitution does not provide a remedy for defamation, even of the worst kind. Rather, to establish his due process claim, Hinkle needed to show a liberty interest with which the defendants interfered. While there is a liberty interest in following one's trade or profession, the government does not deprive a plaintiff of such an interest by defamation alone. The defamation must combine with an alteration or removal of a legal status. Hinkle did not show any alteration of his legal status and thus cannot succeed on his due process claim. Accordingly, the district court properly granted the defendants summary judgment. We AFFIRM.

---

[4]    Hinkle also presented evidence that the defendants' conduct caused customers to stop patronizing a restaurant run by his son in which he had a financial interest. But Hinkle did not present any evidence that the defendants somehow altered his legal status in a way that would prevent him from opening up, or investing in, another restaurant. Accordingly, Hinkle also cannot show that the defendants violated any purported liberty interest in the occupation of restaurateur.